314 F.2d 418
 DEATON TRUCK LINE, INC., Appellant,
v.
LOCAL UNION 612, AFFILIATED WITH the INTERNATIONAL
BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN
AND HELPERS OF AMERICA, Appellee.
 No. 19688.
 United States Court of Appeals Fifth Circuit.
 Nov. 16, 1962, Rehearing Denied March 14, 1963.
 
 C. V. Stelzenmuller, M. L. Taliaferro, Birmingham, Ala. (Moore, Thomas, Taliaferro, Forman & Burr, Birmingham, Ala., of counsel), for appellant.
 Douglas Corretti, Birmingham, Ala., L. N. D. Wells, Jr., Dallas, Tex., David Previant, Milwaukee, Wis., Donald L. Newsom, Birmingham, Ala. (Mullinax, Wells, Morris & Mauzy, Dallas, Tex., Corretti & Newsom, Birmingham, Ala., of counsel), for appellee.
 Before RIVES, JONES and BELL, Circuit Judges.
 RIVES, Circuit Judge.
 
 
 1
 Appellee, Local Union 612, sued appellant, Deaton Truck Line, Inc., for specific performance of an agreement to arbitrate two labor disputes or grievances. Jurisdiction was claimed under Section 301(a) of the Taft-Hartley Act, 29 U.S.C.A. 185(a).[1]
 
 
 2
 Deaton is an irregular route common carrier by motor vehicle operating under a certificate of convenience and necessity granted by the Interstate Commerce Commission. It operates approximately 250 tractor power units, but owns only two such units in over-the-road operation. The remaining tractor power units are leased by Deaton under leases which provide that the owners of the tractors shall purchase and pay for the State license tags. The 'vast majority' of the men who own tractors drive their own units. Others own trucks and tractors but do not drive. Several drivers own more than one unit of equipment. Some wives of drivers own units and engage men to drive them. Deaton has 4 or 5 yardmen (including Harry Williams, a city truck driver) and two over-the-road drivers who are, without dispute, its employees.
 
 
 3
 The Union disclaimed representation of 'owners' who do not drive, but claimed to represent owner-drivers, as well as the few drivers who were admittedly employees. Owner-drivers pay for fuel, maintenance, and other operating expenses of their units. They are compensated on a basis of percentage of gross revenue-- 20% As to ordinary freight, and 25% As to freight that is over length, over width, or carries a premium rate. The two over-the-road drivers who drive units owned by Deaton are paid on the basis of 20% Of revenue.
 
 
 4
 An agreement in the form of a collective bargaining contract was entered into between the Union and Deaton effective from August 1, 1959 through July 31, 1962.[2] The contract contains some twenty-six articles. By its terms, Deaton agrees '* * * that all Mechanics, Helpers, Drivers, Driver Owners, etc. covered by this Agreement, employed by the Company must become members of Local Union No. 612 if their employment continues beyond thirty (30) days from the date of their hiring.' There are provisions for a check-off of Union dues and initiation fees, for a Union grievance committee, for time off to attend to Union business, for wages, hours, and vacations, seniority, etc. In part, the contract provides:
 
 
 5
 'Non-Owner Drivers of Leased Equipment
 
 
 6
 '(a) Drivers shall be paid once per week on Saturday morning 10 to 12 Noon for all bills turned in to the Birmingham Terminal prior to 3 p.m. Friday.
 
 
 7
 '(b) Owners of leased equipment agree drivers of said equipment shall be paid a minimum of:
 
 
 8
 '20% Of gross revenue
 
 
 9
 'All freight such as over length-- over width-- or freight carrying premium rate driver shall receive 25% Of gross revenue.
 
 
 10
 '(c) The Company shall continue to operate on a percentage of revenue basis:
 
 
 11
 'Complete Unit 75% Of gross
 
 
 12
 '6th Class Freight or better 70% Of gross.'
 
 
 13
 The complaint filed by the Union sought arbitration with respect to the claimed violation by Deaton of two provisions of the contract:
 
 
 14
 'Company City truck driver to be paid the prevailing Birmingham rate.''State Mileage Tax and License Tag
 
 
 15
 'In the event that the Alabama mileage tax is repealed and license tags are increased the Company agrees to pay the equivalent of the tax to the operators to apply on the increased cost of the Alabama State License Tag, not to exceed increase in cost of the Alabama State License Tag.'
 
 
 16
 The provisions for arbitration are included in Article 6, as follows:
 
 
 17
 'Grievance Procedure
 
 
 18
 'Grievance or disputes arising in connection with this contract will be handled in the following manner:
 
 
 19
 '1. The Committee will make every effort to settle the matter.
 
 
 20
 '2. Failure on the part of the Committee to satisfactorily settle the matter. It will be referred to the Local Union and Top Management for settlement.
 
 
 21
 'If the Union and the Company fail to agree, the dispute may be submitted to the arbitration and the decision of the arbiter shall be final. The arbiter shall have authority to make awards on all matters coming within the scope of this agreement except on matters pertaining to increase or decrease of compensation to the Employees unless provided for in this Agreement. The arbiter to be agreed upon by the parties.
 
 
 22
 'Cost of arbitration, if necessary, will be equally shared by the parties.
 
 
 23
 'It is agreed that the best interest of the parties is served by the handling of appeals as soon as possible and every effort will be made to have a decision in seven (7) days.
 
 
 24
 'There shall be no strikes or lockouts by the parties until the grievance procedure herein has been complied with.'
 
 
 25
 The parties are in accord that by an Act of the Legislature of Alabama, effective October 1, 1961, the mileage tax was repealed and the cost of license tags was increased by from $50.00 to $450.00. Code of Alabama Recompiled 1958, Pocket Supplement, Title 51, Sec. 697(1)(b). The district court found:
 
 
 26
 'A dispute arose between the company and the union as to the meaning and construction of the provision in the contract pertaining to the State Mileage Tax and License Tags, and considerable negotiation was had by officials of the company and the union, and their respective attorneys. The union demanded arbitration of the issue. The company agreed to submit the question to arbitration, but specifically limited its agreement to arbitrate to submitting the contract and briefs to the arbiter, without the taking of any testimony whatsoever. The union refused to submit the issue to arbitration on such a limited basis, and brought this action to compel the company to arbitrate as provided by Article 6 of the contract between the parties * * *.'
 
 
 27
 As to the wage rates of Harry Williams, Deaton's city truck driver, the district court found:
 
 
 28
 '* * * It is not disputed that Williams has been paid at all times since the commencement of the agreement the sum of $2.54 per hour. The union contends that the Birmingham prevailing rate is $2.77 per hour. The union has demanded orally and in writing, that this question be submitted to arbitration. Although the company contends that it has never refused to arbitrate this issue, the union has been demanding arbitration of the wage scale of Williams for many months and no arbitration of this issue has been held.'
 
 The district court ordered and adjudged:
 
 29
 '1. That the issue of the wages, past, present and future, of defendant's employee, Harry Williams, be submitted to an arbiter to be agreed upon by the parties within fifteen days from the date of this decree.
 
 
 30
 '2. That the rights, liabilities and responsibilities of the defendant company and other persons subject to the contract with reference to the 'state mileage tax' be submitted to an arbiter to be agreed upon by the parties within thirty days from the date of this decree.
 
 
 31
 '3. In the event the parties have not agreed upon an arbiter as provided for by the terms of the contract, and such fact is made known to this Court in writing by counsel of either party, this Court will appoint an arbiter to hear and decide the issues specified in Paragraphs 1 and 2 above.'
 
 
 32
 The main issue urged by Deaton on this appeal is that the district court had no jurisdiction under Section 301 of the Taft-Hartley Act, 29 U.S.C.A. 185 (n. 1, supra) over the mileage taxlicense tag dispute because it was not a labot grievance but a commercial dispute between independent contractorlessors and their lessee. Deaton's contention is predicated upon too narrow a meaning of 'contracts' as used in Section 301(a) (n. 1, supra). It is now settled that 'contracts', as there used, includes more than 'collective bargaining agreements,' and is broad enough to include any agreement 'between employers and labor organizations significant to the maintenance of labor peace between them.' Retail Clerks International Ass'n, Local Unions Nos. 128 and 633 v. Lion Dry Goods, Inc., 1962, 369 U.S. 17, 27, 28, 82 S.Ct. 541, 548, 7 L.Ed.2d 503. The Supreme Court has heretofore taken the position that it is not necessary to determine whether owner-operators are 'employees' protected by the Act, since the establishment of minimum rental to them was integral to the establishment of a stable wage structure for clearly covered employee-drivers. Local 24 of International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL-CIO v. Oliver, 1959, 358 U.S. 283, 294-295, 79 S.Ct. 297, 3 L.Ed.2d 312; United States v. Drum, 1962, 368 U.S. 370, 382, n. 26, 82 S.Ct. 408, 7 L.Ed.2d 360. It is true that in Oliver, approved in Drum, the bargaining unit included an overwhelming majority of concededly employed drivers, while in the present case there are very few admitted employees, and an overwhelming majority of lessor-drivers. However, the Union points out, soundly we think, that it has a legitimate interest in protecting its area wage standards. See In re Local Union No. 741, etc. (Keith Riggs Plumbing, etc.), 1962, 137 NLRB No. 121, 50 L.R.R.M. 1313 at 1314. Moreover, Deaton acknowledges that it has some 'employees.' It cannot, then, be denied that the contract was 'between an employer and a labor organization representing employees (etc.).' within the meaning of Section 301(a) (n. 1, supra). That section is then broad enough to include any agreement significant to the maintenance of labor peace between the employer and the Union. Clearly, the mileage taxlicense tag agreement comes within that class.
 
 
 33
 Appellant argues that the use of the word 'may' in the contract prevents arbitration from being compulsory or obligatory. Clearly, however, 'may' should be construed to give either aggrieved party the option to require arbitration. United Steelworkers of America v. American Mfg. Co., 1960, 363 U.S. 564, 565, n. 1, 80 S.Ct. 1343, 4 L.Ed.2d 1403; International Association of Machinists, AFL-CIO, v. Hayes Corp., 5 Cir., 1961, 296 F.2d 238, 241, n. 6.
 
 
 34
 The merits of the grievance, the questions of laches and of whether there had been sufficient compliance with steps 1 and 2 of the grievance procedure are all matters for the arbiter and not for the Court. United Steelworkers of America v. Warrior & Gulf Navigation Co., 1960, 363 U.S. 574, 585, 80 S.Ct. 1347, 4 L.Ed.2d 1409.
 
 
 35
 The judgment stated that if the parties did not agree on an arbiter as provided by the terms of the contract the Court would appoint one. Appellant objects that the contract did not give the district court authority to appoint an arbiter in any event. Even though the district court has not actually appointed an arbiter and the parties may agree on one and make that unnecessary, we think sound judicial administration requires us to review this part of the judgment to determine whether it brings unwarranted pressure on the parties to agree, and also to avoid the possible necessity of another appeal.
 
 
 36
 It is important for labor peace that the processes of arbitration not be permitted to fail.[3] To that end the courts are authorized, indeed are under a duty, to exercise a 'range of judicial inventiveness.' Textile Workers Union v. Lincoln Mills, 1957, 353 U.S. 448, 457, 77 S.Ct. 923, 1 L.Ed.2d 972.
 
 
 37
 Much the same problem was faced by Judge Wyzanski in Textile Workers Union of America (CIO) v. American Thread Co., D.C.Mass., 1953, 113 F.Supp. 137, 142:
 
 
 38
 'Defendant's final point is that this case cannot be sent to arbitration because no arbitrator has been named under the 1951 memoranda. But this defect can be and should be cured by this Court adopting as a guiding analogy the practice under 5 of the Federal Arbitration Act, 9 U.S.C. 5. It the parties are unable within ten days to agree upon an arbitrator, this Court will appoint one.'
 
 
 39
 Such a solution has now been approved by the Supreme Court. General Electric Co. v. Local 205, 1957, 353 U.S. 547, 548, 77 S.Ct. 921, 1 L.Ed.2d 1028, aff'g Local 205, United Electric, Radio and Machine Workers of America (UE) v. General Electric Co., 1 Cir., 1956, 233 F.2d 85, 101; see also Engineers Ass'n v. Sperry Gyroscope Co., etc., 2 Cir., 1957, 251 F.2d 133, 136.
 
 
 40
 We agree with the material findings of fact and conclusions of law of the district court, and its judgment is
 
 
 41
 Affirmed.
 
 On Petition for Rehearing
 
 42
 PER CURIAM.
 
 
 43
 The following paragraph of the opinion on original hearing is withdrawn.
 
 
 44
 'The Union disclaimed representation of 'owners' who do not drive, but claimed to represent ownerdrivers, as well as the few drivers who were admittedly employees. Owner-drivers pay for fuel, maintenance, and other operating expenses of their units. They are compensated on a basis of percentage of gross revenue-- 20% As to ordinary freight, and 25% As to freight that is over length, over width, or carries a premium rate. The two over-the-road drivers who drive units owned by Deaton are paid on the basis of 20% Of revenue.'
 
 
 45
 In lieu of the paragraph just withdrawn, the following paragraph is substituted.
 
 
 46
 On this appeal the Union disclaims representation of 'owners' who do not drive, and claims to represent owner-drivers, as well as the few drivers who were admittedly employees. It appears to us that in the agreement and in the district court the Union attempted to represent all owners as well as all drivers. Owners and owner-drivers pay for fuel, maintenance and other operating expense of their units. They are compensated on a percentage of gross revenue basis-- 70 per cent of gross revenue on all freight of sixth class or higher classification, and 75 per cent on all freight of seventh class or lower classification.[4] Non-owner drivers of leased equipment were compensated by the owners on a basis of percentage of gross revenue-- 20% As to ordinary freight, and 25% As to freight that is over length or over width and freight carrying a premium rate. The two over-the-road drivers who drive units owned by Deaton are paid on the basis of 20% Of the gross revenue of the loads they drive.
 
 
 47
 From the concluding part of the sentence in the original opinion which reads as follows: 'The parties are in accord that by an Act of the Legislature of Alabama, effective October 1, 1961, the mileage tax was repealed and the cost of license tags was increased by from $50.00 to $450.00,' there are withdrawn the following words and figures, viz.: 'by from $50.00 to $450.00.'
 
 
 48
 The appellant vigorously insists that under the evidence it is clear that the increased cost of the Alabama State License Tag falls entirely on the truck owners' share of the gross revenue and has no direct effect on the drivers' compensation. While we do not decide that question, we conclude that we erred in the original opinion in expressing the view (or any view one way or the other) that the mileage tax-license tag agreement comes within the class of agreements significant to the maintenance of labor peace between the employer and the Union. Whether it does so, or whether it relates mainly to the sum paid for truck rental and affects wages remotely and indirectly, if at all, and the effect, if any, of the increased cost of the license tags on the drivers' compensation are all matters going to the merits of the grievance, and, hence, to be decided initially by the arbitrators. United Steelworkers of America v. American Mfg. Co., 1960, 363 U.S. 564, 569, 80 S.Ct. 1343, 4 L.Ed.2d 1403.
 
 The petition for rehearing is
 
 49
 Denied.
 
 
 50
 JONES, Circuit Judge (concurring specially).
 
 
 51
 It seems to me very doubtful that the appointment of an arbiter in a labor dispute is a judicial function that can be assigned to a court of the United States. It approval is to be given to the carrying out of a statutory provision authorizing such an appointment, I think the validity, as well as the desirability, of that portion of the judgment relating to an appointment by the Court should be expressly passed upon.
 
 
 
 [1]
 '(a) Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.'
 
 
 [2]
 We are informed by the parties that the contract has been extended on an indefinite basis, pending the possible negotiation of a new agreement
 
 
 [3]
 See Isaacson, 'The Grand Equation: Labor Arbitration and the No-Strike Clause,' 48 American Bar Ass'n Journal (October 1962), 914
 
 
 [4]
 95% Of the freight handled by Deaton is Class 7 or lower
 JONES, Circuit Judge (concurring specially).
 I adhere to the views expressed in my special concurrence in the original opinion.