**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**DEATON TRUCK LINE, INC., Respondent.**

**No. 24050.**

United States Court of Appeals Fifth Circuit.

Feb. 2, 1968.

Rehearing Denied March 13, 1968.

Marcel Mallet-Prevost, Asst. Gen. Counsel, N. L. R. B., Elliott Moore, Atty., N. L. R. B., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Washington, D. C., for petitioner.

M. L. Taliaferro, C. V. Stelzenmuller, Birmingham, Ala., for respondent; Thomas, Taliaferro, Forman, Burr & Murray, Birmingham, Ala., of counsel.

Before RIVES, GOLDBERG and DYER, Circuit Judges.

DYER, Circuit Judge:

In what seems to be an unremitting stream of labor litigation involving the union, the National Labor Relations

Board, and Deaton Truck Line, Inc.,[1] the latter two are before us once again.[2] The Board seeks enforcement of its order [3] finding that Deaton had violated section 8(a) (3) and (1) of the National Labor Relations Act [4] by discharging 34 employees for participating in protected concerted activities, namely, striking because Deaton refused to pay a portion of the 1962, 1963 Alabama license tag fees for trucks leased to it.

Deaton is an irregular motor carrier certified by the Interstate Commerce Commission. During the period in question most of the tractors used in its business were leased by Deaton on a year to year basis, terminable by either party on thirty days' written notice. For convenient reference the owner and driver relationships in the Deaton fleet may be classified as follows: (1) Deaton employees who drive Deaton owned trucks; (2) Owner-drivers who own a single truck which they drive and lease to Deaton; (3) Multiple-Owner-drivers who lease several trucks to Deaton, drive one of them and select drivers for the others from among drivers approved by Deaton; (4) Non-driving owners, and (5) Non-Owner drivers, who drive trucks owned by either a multiple owner-driver or by a non-driving owner as the case may be, who has leased trucks to Deaton.

On August 1, 1959, Deaton and the Union signed a three year agreement. Article 6 provided, among other things:

> If the Union and the Company fail to agree, the dispute may be submitted to arbitration and the decision of the arbiter shall be final. The arbiter shall have authority to make awards on all matters coming within the scope of this agreement except on matters pertaining to increase or decrease of compensation to the Employees unless provided for in this Agreement. The arbiter to be agreed upon by these parties
>
> \*   \*   \*   \*   \*   \*
>
> There shall be no strikes or lockouts by the parties until the grievance procedure herein has been complied with.

Article 10 provided *inter alia* that if the Alabama mileage tax was repealed and the cost of truck license tags was increased, Deaton would pay the equivalent of the tax to the owners to apply on the increased cost of the tags.

By legislative enactment effective October 1, 1961, the Alabama mileage tax was repealed and the cost of license tags was substantially increased. Deaton and the Union disputed the meaning of Article 10 as it pertained to the legislation and the Union demanded arbitration under Article 6 of the contract. Deaton agreed to arbitrate this dispute but insisted on limiting the proceeding to a submission solely on the contract and briefs, contending that there was no labor grievance involved—only a commercial dispute. The Union rejected this and sought specific performance, and at the time of the events here involved the Union action was before this Court on appeal. Deaton Truck Line, Inc. v.

---

1. For simplicity, the petitioner will be referred to as the Board, the respondent as Deaton, and Local 612, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, as the Union.

2. Former appearances before this Court are noted at: Intern. Broth. of Teamsters, etc., Local 612 v. Deaton Truck Line, Inc., 5 Cir. 1962, 307 F.2d 748; Deaton Truck Line, Inc. v. Local Union 612, 5 Cir. 1962, 314 F.2d 418; Deaton Truck Line, Inc. v. N. L. R. B., 5 Cir. 1964, 337 F.2d 697. In each of these cases, as here, Deaton contended that the dispute was a commercial one between it and its independent contractors, and that drivers were not its employees. In the first case we found that the controversy was moot at the time of trial. In the second case we affirmed the judgment of the district court that the issues should be arbitrated. This was never accomplished because the parties would not agree to arbitrate the preliminary question of substantive arbitrability. In the third case we held that Deaton's drivers were employees and not independent contractors, but this holding is challenged on this appeal as not being *res judicata*, and is discussed in the opinion infra.

3. 152 N.L.R.B. 1531.

4. 29 U.S.C.A. § 158(a) (1), (3).

Local Union 612, 5 Cir. 1962, 314 F.2d 418.[5]

In May 1962 negotiations for a new contract began, but agreement was not reached principally because of disputes over who would pay the increased license tag fee, and over the status of certain drivers as employees or independent contractors. In the latter part of July, 1962, shortly before the existing contract was to expire, Deaton and the Union executed a Truce Agreement, which continued the existing agreement in effect, subject to certain conditions.[6]

From July until November, 1962, the parties remained intractable. On November 11, 1962, the Sunday before the November 15, 1962, expiration date for 1962 tags, the Union held a meeting in response to growing dissatisfaction of its members over the prospect of again buying tags without a contribution from Deaton. The meeting was attended not only by single owner-drivers and non owner-drivers, but also by multiple owner-drivers and non driving-owners. What transpired at the meeting is not entirely clear. After a discussion during which the union officials told the group that the union would not tell them not to buy tags but that this was a decision for the group to make, those present voted unanimously not to buy the tags unless Deaton "came up with their part of the money," but that they would make themselves available for work without tractors and see what Deaton would do.

This plan having come to Deaton's attention, it wrote letters to the truck owners on November 13, 1962, offering to settle its liability for the 1962 tags by paying to the owner one percent of the gross revenue earned by the truck from October 1, 1961, to October 1, 1962, provided the truck was operating in the Deaton fleet on November 1, 1961.[7] On the same day Deaton wrote to all of the drivers in the fleet informing them that the proposed concerted activity would violate the existing contract.[8]

5. See note 2 supra.

6. The Truce Agreement provided, "Whereas the current collective bargaining contract * * * will expire July 31, 1962, and whereas * * * [the parties] are presently mutually desirous of maintaining the status quo * * * with respect to labor relations * * *, it is therefore mutually agreed:

"1. The current collective bargaining contract (as modified herein) shall remain in effect until either party serves a thirty-day notice on the other party of his election to terminate the agreement, in which event the parties agree that all necessary notices to the Federal Mediation and Conciliation Service and the State Mediation Service have already been served, and the right to strike or lockout shall accrue to the parties thirty days after such notice if they elect to take such action.

"2. Future grievances which shall arise during the term of this Truce Agreement shall be determined through the contract grievance procedure. In the event of failure of settlement of any such grievance by the parties, such grievance shall be submitted to arbitration before an arbitrator to be appointed by the presiding judge of the United States District Court, Northern District of Alabama * * *"

7. Deaton's letter stated: "A number of owners have inquired what Deaton would do concerning for hire tags. In response, the Company makes this offer:

"It will settle with any owner its liability, if any, for [the expiring] 1962 tags by paying in cash immediately one percent of the gross revenue earned by the truck from October 1, 1961, to October 1, 1962, provided the truck was operating in the Deaton fleet on November 1, 1962.

"This proposition is for immediate acceptance and may be withdrawn at any time."

8. Deaton's letter stated: "We have been informed that the International and Local Unions are planning a strike on Friday, November 16, 1962. This strike will be in direct breach of the present contract.

"This is to notify you that seniority has never been used to select a truck. There will be no lay-offs by the Company on Friday and, therefore, no place for seniority to operate.

"Those trucks that are properly equipped will be expected to operate as in the past, with each using the driver now operating it. Others need not apply, and if they

On November 16, 1962, the date on which the new license tags were required, and coincidentally the date of this Court's original opinion in the arbitration suit,[9] a large number of trucks were taken out of service because the owners failed to equip them with tags, or the drivers failed to show up, or for no stated reason. Owner-drivers, non-driving owners, and multiple owner-drivers were all involved. Those whose trucks were properly licensed signed the "ready book" in the usual manner. Some owner-operators whose trucks were not licensed were permitted to sign the "ready book" but did not designate their truck number. Each person who appeared for work also volunteered for a driving assignment on one of forty Deaton owned trucks claiming seniority rights, but these requests were refused. The net result was that Deaton had to reject business for lack of equipment. Deaton immediately attempted to induce the drivers and owners to come back. On November 19, 1962, Deaton cancelled the leases of those owners who on that date still had not purchased tags, or, having purchased them, had failed to return to work.[10]

On December 6, 1962, Deaton gave a thirty day notice to the Union cancelling the Truce Agreement "in view of the Union's constantly stirring up trouble." On December 31, 1962, Deaton's president sent a letter to those who were then driving in the Deaton fleet, except those involved in the November 16 incident, stating, among other things: "I also stated that I would not be willing to lease or have the men drive in the

Deaton fleet that quit on November 15 in a conspiracy to close the Company."

Acting on charges filed by the Union the Board found that (1) the concerted refusal by the owner-drivers to provide licensed trucks on November 16 was a strike; (2) the strike was not in violation of the Truce Agreement and was thus protected, and (3) the employees were discharged while on strike and were therefore entitled to back pay only if they were denied reinstatement and then only from the date on which they made an unconditional request to return to work with a licensed truck. Deaton challenges the Board's findings on a broad front.

### Employee Status of Deaton's Drivers

Deaton has consistently argued since 1961 that none of the discriminatees were its employees. If they were not, then there was no strike. Relying on our decision in Deaton Truck Line, Inc. v. N. L. R. B., 5 Cir. 1954, 337 F.2d 697,[11] in which we agreed with the Board that the owner-drivers and non owner-drivers were Deaton's employees, the Trial Examiner and the Board refused to admit evidence of the status of these individuals. Deaton argues that it has not had its day in court and that our 1964 decision is not *res judicata* as to it because we found that Deaton was not a party aggrieved by the Board's order and dismissed its petition for review.[12] We disagree.

In Deaton Truck Line, Inc. v. N. L. R. B., supra, we took pains to point out

---

come on Company property, they will be considered trespassers. Mass demonstrators will be treated as trespassers. * * *"

9. See note 2 supra.

10. The cancellation letter said: "This is to notify you that Deaton Truck Line, Inc., hereby elects to terminate your lease or leases on all of your equipment under, in accordance with, and pursuant to the terms of said lease agreement. This is the thirty-day notice of cancellation in accordance with the terms of said lease or leases."

11. See note 2 supra.

12. Both Deaton and the Union had filed petitions for review of the order of the N.L.R.B. which dismissed an unfair labor practice complaint. Deaton did not object to the dismissal but did object to the Board's findings that its owner-lessees were employees rather than independent contractors. We dismissed Deaton's petition because it was not an aggrieved party and denied the union's petition because the union had erroneously included in the bargaining unit multiple owner-drivers who the Board had properly held to be supervisors.

that "while the ruling was favorable to Deaton, Deaton's disagreement with the reasoning is so basic that we think the court should decide the question of such obvious importance to Deaton's labor-management relations." Id. at 698, n. 2. Unquestionably we had jurisdiction to review the Board's order on the union's petition to review, which encompassed the very issue that Deaton raised. Thus the dismissal of Deaton's petition did not foreclose us from making a determination as to the validity of the Board's finding of an employment relationship— a finding necessary to the disposition of the issue before us.[13] This matter having been once determined is not open to relitigation. Commissioner of Internal Revenue v. Sunnen, 1948, 333 U.S. 591, 598, 68 S.Ct. 715, 92 L.Ed. 898. Therefore Deaton's proffer of evidence on this issue was properly denied.

### Deaton's Charge that the Strike Was Not Protected Concerted Activity

■ The first thrust made by Deaton is that the owner-drivers who withdrew their trucks from Deaton's fleet by failing to buy tags, as required by their leases, and without giving thirty day notice of cancellation which, it is claimed, was mandatory under the I.C.C. rules, acted contrary to and in defiance of their leases and the rules, and hence such action was unprotected. In essence, Deaton says that there was a breach of contractual provisions required by law. We disagree.

The regulation referred to requires a company serving its certified routes with non-owned equipment, which is driven by the owner of the equipment or his employee, to provide in the lease for a term of not less than thirty days during which time the company assumes complete responsibility for the equipment.[14] The purpose of this rule is to avoid trip leasing which can be utilized "as a convenient device for delegating to the lessor some, at least, of the authority held by the lessee." Lease and Interchange of Vehicles by Motor Carrier, 64 M.C.C. 361, 365, 68 M.C.C. 553–555. With this we, of course, are here not concerned and it is, therefore, unnecessary for us to consider the accommodation of the "policies of the Interstate Commerce Act and the labor act * * * one to the other," as Deaton suggests we must do. Burlington Truck Lines, Inc. v. United States, 1962, 371 U.S. 156, 172, 83 S.Ct. 239, 248, 9 L.Ed.2d 207.

As between Deaton and its employees we are unpersuaded that the latter can be held to have breached the lease by failing to buy tags, when Deaton apparently failed to meet the requirement upheld by this Court that Deaton participate in the arbitration of the tag controversy. See n. 2, supra.

### Attempt to Unilaterally Change Deaton's Operations

■ Deaton charges that the strike involved an attempt by the discriminatees to stay on its payroll on their own terms and to unilaterally change the method of Deaton's operation. Relying upon the line of cases that condemn such action[15] Deaton argues that this harassing type of concerted activity is unprotected by section 7.

---

13. Deaton appealed and filed briefs which exhaustively explored the employee status issue.

14. I.C.C. Rules on Motor Vehicles, 68 M. C.C. 560–563, 21 F.R. 9643, 49 C.F.R. § 207.4.

15. Teamsters, Chauffeurs and Helpers Local Union No. 79, etc. v. N. L. R. B., 1963, 117 U.S.App.D.C. 84, 325 F.2d 1011; N. L. R. B. v. Ryder Tank Lines, 4 Cir. 1962, 310 F.2d 233; N. L. R. B. v. J. I. Case Co., 8 Cir. 1952, 198 F.2d 919, cert. denied 345 U.S. 917, 73 S.Ct. 729, 97 L.Ed. 1351; Home Beneficial Life Ins. Co. v. N. L. R. B., 4 Cir. 1947, 159 F.2d 280, cert. denied, 332 U.S. 758, 68 S.Ct. 58, 92 L.Ed. 344; N. L. R. B. v. Montgomery Ward & Co., 8 Cir. 1946, 157 F.2d 486; N. L. R. B. v. Mt. Clemens Pottery Co., 6 Cir. 1945, 147 F.2d 262; Firth Carpet Co. v. N. L. R. B., 2 Cir. 1942, 129 F.2d 633; C. G. Conn, Ltd. v. N. L. R. B., 7 Cir. 1939, 108 F.2d 390; Valley City Furniture Co., 1954, 110 N.L. R.B. 1589.

The owner-drivers who presented themselves and their trucks without the state-required tags were unable to provide any of the services expected by Deaton. Since their pay was predicated on the loads they carried, they collected no pay for the period beginning the morning of November 16. Thus the authorities relied upon by Deaton holding that an employee may not engage in a "partial strike" by working and drawing pay, while withholding part of his services, are readily distinguishable from this case where there was only an uncompensated offer by employees to work on other terms.

### The Truce Agreements' No Strike Clause

■■ As pointed out earlier, shortly before the 1959 agreement was to expire in 1962, the parties entered into a Truce Agreement which continued the then current agreement in effect subject to a 30 day notice of termination with the right to strike thereafter and with provisions for grievance procedure and arbitration.[16] Deaton challenges the Board's finding that the strike did not violate the Truce Agreement, contending that Deaton's refusal to contribute toward the 1963 tags was a new dispute, different and apart from its refusal to contribute toward the 1962 tags (except by a formula different than that called for in the contract). We agree with the Board that the dispute which resulted in the strike was fundamentally a continuation of the same unsettled dispute which was and had been going on over payment for the 1962 tags and which the union had attempted to resolve by complying with the grievance procedure. More importantly, however, Deaton has from the beginning and still does contend that the tag issue is not arbitrable.[17] While it is true that "a strike to settle a dispute which a collective bargaining agreement provides shall be settled exclusively and finally by compulsory arbitration constitutes a violation of the agreement," Local 174, Teamsters, Chauffeurs, etc. v. Lucas Flour Co., 1962, 369 U.S. 95, 105, 82 S.Ct. 571, 577, 7 L.Ed.2d 593, there must be a determination of the threshold question "as to whether compulsory and binding arbitration has been agreed upon, and, if so, as to what disputes have been made arbitrable," id. at 106, 82 S.Ct. at 578. If it has not been agreed that arbitration is the exclusive method of settling the dispute in question, a strike is not in breach of the contract. Accepting *arguendo* that the 1963 tag dispute was a new one and thus a future grievance under the Truce Agreement, the strike was a protected activity because of Deaton's non-varying position that the dispute was not a grievable one and would never be settled by arbitration. See Vaca v. Sipes, 1967, 386 U.S. 171, 185, 87 S.Ct. 903, 17 L.Ed.2d 842.

■ Nor are we persuaded by Deaton's argument that the Truce Agreement contained an absolute agreement not to strike. The Truce Agreement was not a new collective bargaining agreement, but merely a stop gap. Read in context it spelled out that the parties had already given the requisite notices under section 8(d)[18] which require a party desirous of terminating an agreement to continue it in effect "without resorting to strike or lock-out" for 60 days after notification of the proposed termination and for 30 days after notifying the mediation services. Thus, the Board found that "The language on which the Respondent particularly relies —'the right to strike or lockout shall accrue to the parties thirty days after such notice'—is quite plainly tied to the section 8(d) (4) requirement which might otherwise have been deemed to be applicable anew to the extension of the contract by the Truce Agreement." The net effect, of course, is that there was an agreement for a single 30 day notice after which the parties might strike or lockout in support of *new* con-

---

16. See note 6, supra.

17. See note 2, supra.

■■■■■■■

18. 29 U.S.C.A. § 158(d).

tract demands, but which, like section 8(d), did not apply to strikes where, as here, the attempt is to *enforce* the old agreement and not to *modify* its terms. Local Union No. 9735 United Mine Workers of America v. N. L. R. B., 1958, 103 U.S.App.D.C. 294, 258 F.2d 146, 149. See also Mastro Plastics Corp. v. N. L. R. B., 1956, 350 U.S. 270, 286, 76 S.Ct. 349, 100 L.Ed. 309.

### The Object of the Concerted Activity

■ Deaton challenges the validity of the Board's finding that a strike by the owner-drivers to require Deaton to pay the tag fees was a protected activity. Deaton urges that the tag payment related only to what the owner-driver received as rental for his truck and thus was unrelated to what he received as a driver. Put another way, there was no evidence to show that the tag money would affect the compensation for driving as distinguished from the sum paid for the use of the truck, and the strike was therefore unprotected because the contract provisions, which the strike sought to enforce were unrelated to "wages, hours, and other terms and conditions of employment." Deaton argues that Local 24 of Intern. Broth. of Teamsters, etc. v. Oliver, 1959, 358 U.S. 283, 79 S.Ct. 297, 3 L.Ed.2d 312, heavily relied upon by the Board, is inapposite because "to show that close relation to wages referred to in *Oliver* it would be necessary to prove the tag money demanded exceeded some owner-drivers' profits on his rental income which he would have to make up from his drivers' wages." [19] To bolster this argument Deaton contends that this was the specific holding on rehearing in Deaton Truck Line, Inc. v. Teamsters Local 612, 5 Cir. 1962, 314 F.2d 418, 424.[20] We disagree on both counts.

*Oliver* cannot be read as narrowly as Deaton suggests. The object of the collective bargaining agreements in both *Oliver* and Deaton are the same, that is "to protect the negotiated wage scale against the possible undermining through diminution of the owner's wages for driving which might result from a rental which did not cover his operating costs." Local 24 of Intern. Broth. of Teamsters, etc. v. Oliver, supra, 358 U.S. at 293-294, 79 S.Ct. at 303. If the rental becomes inadequate because of increased costs the owner-driver must absorb the difference which in turn reduces his wages as a driver. The result must be that the non-owner drivers will lose their jobs to the owner-drivers or be pressured by their owners to forego some of their contract wages so that the owner may remain competitive. To forestall this likelihood the Union here negotiated a bargaining agreement which provided that Deaton would pay these costs. The absence of a showing of an actual impact on wages in this case (which Deaton points to as distinguishing this case from *Oliver*) we think is of no moment since the potential impact warranted the protection. This being so there is no doubt about the propriety of the Union's bargaining for such a provision, and Deaton having agreed to it, the employees gained a right protected by section 7 of the Act. Deaton misreads our opinion on rehearing in Deaton Truck Line, Inc. v. Local Union 612 [21] as expressing a contrary view. There we declined to express any view, one way or the other, whether the mileage tax-license agreement comes within the class of agreements significant to the maintenance of labor peace between the employee and the Union, because this question and others related to it were "all matters going to the merits of the grievance, and, hence, to be decided initially by the arbitrators." 314 F.2d at 424.[22]

---

19. Respondent's brief pp. 41-42.

20. See note 2, supra.

21. See note 2, supra.

22. On rehearing we said in pertinent part:
The appellant vigorously insists that under the evidence it is clear that the increased cost of the Alabama State License Tag falls entirely on the truck

Unfortunately, this issue was never submitted to arbitration because the Union would not agree to Deaton's insistence upon arbitration of the preliminary question of substantive arbitrability. Consequently, five years, sixty-eight volumes and many miles later we are revisited by, and must now determine, essentially the same dispute.

Little need be said about Deaton's contention that the agreement concerning tag payments was a price fixing arrangement and thus a violation of the anti-trust laws, because this must necessarily be based upon a finding that the agreement had only a remote and indirect effect on wages.[23] The Board's express finding, with which we agree, that the contract provision "was closely related to and directly affected" wages effectively destroys Deaton's anti-trust argument. Nor in the light of what we have said need we elaborate on the argument that there was concerted activity by members of the Union to force upon Deaton a settlement of a disputed claim for money which is not protected activity under section 7.

Some eight of about one hundred of those who withheld trucks on November 16, 1962, were non-driving owners. Deaton points out that they could not be employees of the company and yet tag money was demanded for them. This concerted activity, it submits, was a violation of the Hobbs Anti-Racketeering Act, 18 U.S.C.A. § 1951.[24] Admittedly the non-driving owners were not employees, and while the Union in its original statement of position made an all-encompassing demand, it withdrew from that position before the events here transpired. Furthermore, at the time of the concerted activity Deaton did not raise this issue, object to or seek a clarification of the employees position. On the contrary, Deaton, anticipating the strikers' demand, issued its ultimatum to all owners that any strike would be unlawful. Since there was no timely assertion by Deaton of an overly broad demand there was no occasion for the employees to clarify their position. See N. L. R. B. v. Comfort, Inc., 8 Cir. 1966, 365 F.2d 867, 877–878; accord, N. L. R. B. v. Anchor Rome Mills, Inc., 5 Cir. 1956, 228 F.2d 775, cert. dismissed, 352 U.S. 802, 77 S.Ct. 20, 1 L.Ed.2d 37. Under the circumstances we cannot say that the employees were attempting to attain an object other than that which the circumstances necessarily attached to their conduct, i. e., the payments for license tags to the owner-drivers all of whom were Deaton's employees.

We have carefully considered the other specifications of error assigned by Deaton and find them to be without merit. The Board's findings and conclusions are supported by substantial evidence on the record taken as a whole and the Board's order is

Enforced.

owners' share of the gross revenue and has no direct effect on the drivers' compensation. While we do not decide that question, we conclude that we erred in the original opinion in expressing the view (or any view one way or the other) that the mileage tax-license tag agreement comes within the class of agreements significant to the maintenance of labor peace between the employer and the Union. Whether it does so, or whether it relates mainly to the sum paid for truck rental and affects wages remotely and indirectly, if at all, and the effect, if any, of the increased cost of the license tags on the drivers" compensation are all matters going to the merits of the grievance, and, hence, to be decided initially by the arbitrators.

23. See Allen Bradley Co. v. Local Union No. 3, etc., 1945, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939.

24. The Hobbs Act makes it a crime to obstruct, delay, or affect interstate commerce by extortion or to attempt to do so.