**SHELLY & ANDERSON FURNITURE MANUFACTURING CO., INC., Petitioner,**

**v.**

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 72–2859.**

United States Court of Appeals, Ninth Circuit.

May 20, 1974.

Don T. Hibner, Jr. (argued), Joseph M. Malinowski, Sheppard, Mullin, Richter & Hampton, Los Angeles, Cal., for petitioner.

Alan Longman (argued), NLRB, Elliott H. Moore, Acting Asst. Gen. Counsel, NLRB, Washington, D. C., William M. Pate, Jr., Counsel for the Gen. Counsel, NLRB, Wilford W. Johansen, Director, Region 21, NLRB, Los Angeles, Cal., for respondent.

Paul Crost, Brundage, Neyhart, Miller, Reigh & Pappy, Los Angeles, Cal., for charging party.

Before KOELSCH and WALLACE, Circuit Judges, and TAYLOR, * District Judge.

## OPINION

WALLACE, Circuit Judge:

Shelly & Anderson Furniture Manufacturing Co., Inc. (Company) petitioned this court to set aside an order of the National Labor Relations Board. 199 N.L.R.B. No. 31 (Sept. 22, 1972).

* Honorable Fred M. Taylor, United States District Judge, Boise, Idaho, sitting by designation.

The Board cross-petitioned for enforcement of its order. We deny the Company's petition and enforce the order.

## I. *The Discharge of Belmont and Saldana*

On February 12, 1971, the Company announced to its employees a cut of 20 to 40% in all piecework rates effective the following Monday, February 15. On Monday, employees Belmont and Saldana contacted the Upholsterers' International Union of North America, Local 15, AFL–CIO (Union), secured union authorization cards and commenced organizational activities. They handed out the cards and arranged for several Union officals to speak with a group of employees on February 17. On February 18, the Union filed a petition for a representation election with the Board. At a Union preelection meeting held on February 24, both Belmont and Saldana made speeches advocating unionization.

Belmont had worked for the Company for 12 years and Saldana had been employed for over three years. Within three weeks after they began union organizational activities they were both discharged without prior warning. As reasons for the discharge, the Company attributes to Belmont and Saldana low production, too much talking and avoidance of low-rated piecework jobs.

The Company's records demonstrate that during the week they were fired, Saldana's production rate was his highest for the entire year and Belmont's rate of production was above his average for the year. Two witnesses testified that neither Belmont nor Saldana talked more than other employees and that neither avoided the low-rated jobs.

The trial examiner discredited the Company's witnesses and found that "[a] preponderance of the reliable, probative and substantial evidence in the entire record convinces me . . . [that the Company's] alleged reasons for discharging Belmont and Saldana were pretexts, and that its real reason was their Union activity . . . ."

While the examiner could have found otherwise, his findings are supported by substantial evidence contained in the record considered as a whole. 29 U.S.C. § 160(e); Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L. Ed. 456 (1951); Marriott Corp. v. NLRB, 491 F.2d 367 (9th Cir. 1974); Famet, Inc. v. NLRB, 490 F.2d 293 (9th Cir. 1973).

## II. *The Protest Demonstration*

The Union won the Board-conducted election and was certified as the employees' bargaining representative on April 30, 1971. Bargaining sessions were conducted on May 25 and June 4 without any progress being made. On June 9, the employees unanimously voted to hold what they referred to as a protest demonstration for 10 or 15 minutes at the beginning of the work day of June 17, the date of the next scheduled bargaining session. The stated purpose of the demonstration was to protest what the employees interpreted as the Company's dilatory bargaining tactics and to demonstrate employee solidarity. A written notice of the meeting was distributed to the employees on June 16 and also came to the attention of Robert Anderson, the Company's president and owner. The notice emphasized that the demonstration was not to be a strike.

On June 17, at 7:30 a. m., instead of punching in on time and going to work, 34 employees attended the demonstration held on a vacant lot a short distance from the plant. In spite of the fact that it was not billed as a strike, the trial examiner concluded that the protest demonstration was a concerted activity that is protected under section 7 of the National Labor Relations Act (Act), 29 U. S.C. § 157. Although the question is a close one, we cannot overturn his conclusion.

In order to be protected under section 7 the concerted activity must satisfy the following elements:

(1) there must be a work-related complaint or grievance; (2) the concerted

activity must further some group interest; (3) a specific remedy or result must be sought through such activity; and (4) the activity should not be unlawful or otherwise improper. 18B Business Organizations, Kheel, Labor Law § 10.02[3], at 10–21 (1973). The protest demonstration clearly satisfies the first three elements. The whole purpose of the demonstration was to protest the Company's alleged stalling in negotiating a contract with the Union. The meeting was designed to benefit all employees rather than any individual employee. The Union representatives made it clear that as a result of the demonstration they hoped the Company would earnestly negotiate the contract.

■■ The fourth element, however, requires a more careful analysis. The courts have consistently held that employees are not entitled to the protection of section 7 when they engage in partial or intermittent work stoppages. *See* NLRB v. Insurance Agents' Union, 361 U.S. 477, 492–494, 80 S.Ct. 419, 4 L.Ed. 2d 454 (1960); Local 232, UAW v. Wisconsin Employment Relations Bd., 336 U.S. 245, 69 S.Ct. 516, 93 L.Ed. 651 (1949). The Company argues that under this line of cases, the demonstration should be unprotected. While it is true that concerted activities that unreasonably interfere with the employer without placing any commensurate economic burden on the employees are not protected, *see* First National Bank v. NLRB, 413 F.2d 921, 924 (8th Cir. 1969), concerted activities that are reasonable means of aiding the union's objectives at the negotiating table are protected. Unprotected activities closest to the facts in this case have generally involved situations where the employees have reported for work and, while receiving their usual wages, have repeatedly and without warning engaged in work stoppages, slowdowns or sit-ins. Such actions disrupt production schedules and impede the employer from using replacement or temporary employees while the protesting employees continue to draw their wages. Thus, they are unprotected because they make it impractical for the employer to operate his business properly. Generally, in order to be protected the employee must choose either to be on the job and subject to the employer's rules or to be off the job and bear the commensurate economic burden. NLRB v. Kohler Co., 220 F.2d 3, 11 (7th Cir. 1955); C. G. Conn, Ltd. v. NLRB, 108 F.2d 390, 397 (7th Cir. 1939).

■ The trial examiner found that the protest demonstration held on June 17 was a reasonable action to exert pressure on the Company to negotiate more earnestly with the Union. The demonstration was announced in advance. The employer knew its objective. Although it was held during a time when the employees should have been at work, they did not draw pay during the time because they were piecework employees and they did not disrupt or interfere with the employees who were not participating.

If the protest had been partial, intermittent or recurrent, the activity would not have been protected. *See* NLRB v. Tonkawa Refining Co., 452 F.2d 900, 902 (10th Cir. 1971). Because the employees were not entitled to pay for the lost time, the activity was not partial. NLRB v. Deaton Truck Line, Inc., 389 F.2d 163, 169 (5th Cir. 1968). The trial examiner found that this was to be a one-time protest. We cannot say that the finding is not supported by the record. Therefore, the employee activity could not be deemed to be intermittent or recurrent. *Cf.* NLRB v. Buzza-Cardozo, 205 F.2d 889 (9th Cir. 1953), cert. denied, 346 U.S. 923, 74 S.Ct. 310, 98 L.Ed. 417 (1954).

Finally, the demonstration lasted only 10 to 15 minutes and would not have had a significant impact upon the operation of the business. By Anderson's own admission, the demonstration did not severely disrupt his production schedule or otherwise necessitate any unusual action on the part of the Company. As the Supreme Court said in NLRB v. Washing-

ton Aluminum Co., 370 U.S. 9, 17, 82 S. Ct. 1099, 1104, 8 L.Ed.2d 298 (1962):

It is of course true that § 7 does not protect all concerted activities, but that aspect of the section is not involved in this case. The activities engaged in here do not fall within the normal categories of unprotected concerted activities such as those that are unlawful, violent or in breach of contract. Nor can they be brought under this Court's more recent pronouncement which denied the protection of § 7 to activities characterized as "indefensible" because they were there found to show a disloyalty to the workers' employer which this Court deemed unnecessary to carry on the workers' legitimate concerted activities. The activities of these . . . employees cannot be classified as "indefensible" by any recognized standard of conduct.

(footnotes omitted.)

Based upon the factual findings of the trial examiner, the protest demonstration is more similar to protected concerted activities than it is to unprotected concerted activities. *Compare* NLRB v. Pepsi-Cola Bottling Co., 449 F.2d 824 (5th Cir. 1971), cert. denied, 407 U.S. 910, 92 S.Ct. 2434, 32 L.Ed.2d 683 (1972), *and* NLRB v. Local 1229, Electrical Workers, 346 U.S. 464, 74 S.Ct. 172, 98 L.Ed. 195 (1953), *with* Electromec Design & Development Co., Inc. v. NLRB, 409 F.2d 631 (9th Cir. 1969). We cannot justifiably conclude that the record as a whole fails to contain substantial evidence to support the finding that the protest demonstration was a protected concerted activity.

### III. *The Lockout*

While the demonstration was in progress, Anderson decided that all of the employees who had participated would be laid off for the rest of the day and ordered the gates to both of his plants closed and locked. At 7:45 a. m., 15 minutes after the demonstration began, the employees presented themselves at the gates and attempted to report for work.

Gonzales, the Union's business manager, reached the plant a few minutes before the main group of employees. He spoke with Anderson, telling him that the demonstration was to protest the Company's stalling at the negotiation table, that he had told the employees to make up the lost time and that he hoped Anderson would not retaliate against the employees. Anderson responded: "You want a protest demonstration, you tell those people they can take the rest of the day and demonstrate."

 The Company argues that even if the demonstration was a protected concerted activity, the employees are not entitled to back wages because they never made an unconditional offer to return to work. Striking employees are generally required to make an unconditional application for reinstatement before they are entitled to receive back pay and an employer generally has no obligation to reinstate them until the application is made. G.P.D. Inc. v. NLRB, 406 F.2d 26, 32 (6th Cir. 1969), cert. denied, 401 U.S. 974, 91 S.Ct. 1193, 28 L. Ed.2d 323 (1971). The Company contends that there was no such application and that the actions of the employees must be construed in light of Gonzales' statements to Anderson, which conditioned the offer to return to work upon the employees being allowed to make up the lost time. The trial examiner concluded that the employees had made an unconditional offer. That conclusion is supported by substantial evidence. Gonzales' offer to make up the lost time can be interpreted as conciliatory and not conditional. He had told the employees to return to work and to make up the lost time. He did not tell them to return to work only if they would be allowed to make up the lost time.

 Even if the record did not substantiate the finding that the employees were unconditionally returning to work, where the employer is guilty of an unfair labor parctice, he is required to offer unconditionally to reinstate the employees, regardless of whether they have applied for reinstatement. *See e.*

g., NLRB v. Southern Greyhound Lines, 426 F.2d 1299 (5th Cir. 1970); G.P.D. Inc. v. NLRB, 406 F.2d 26, 32 n.6 (6th Cir. 1969), cert. denied, 401 U.S. 974, 91 S.Ct. 1193, 28 L.Ed.2d 323 (1971). The reason for requiring an unconditional offer to return is that employees who have caused their own unemployment should be required to notify the employer that the work stoppage is over. In the present case Anderson knew that the work stoppage was announced to last only 15 minutes even before the demonstration began. It was obvious when the employees presented themselves at the gate that they wanted to work. Anderson admitted that his motive was to punish those employees who had participated in the demonstration and that the lockout was not caused by any economic or production necessities. There was substantial evidence in this case to sustain the trial examiner's finding that this punitive lockout constituted an unfair labor practice in violation of section 8(a)(3) and (1) of the Act.

## IV. *Written Offer*

The Union concluded that the lockout was an unfair labor practice by the Company. Picketing commenced immediately and continued for the remainder of the working day. That evening Anderson conferred with his labor consultant who advised him that in order to avoid charges of illegally soliciting strikers off the picket line, he should require the returning employees to sign written forms. The consultant suggested that he use the Company's normal employment forms, but add the words, "This is an unconditional" along the top, so that the forms read: "This is an unconditional Application for Employment." The Company followed this advice and when the employees presented themselves at the plant on the morning of June 18, offering to return to work, a demand was made that they sign the forms before they could be reinstated. The Union advised the employees not to sign. None of the employees met the Company's demand and none were reinstated. Picketing resumed.

■ The Company could not condition reinstatement on the requirement that the employees sign an application for employment. They never ceased being employees. In NLRB v. Mackay Radio & Telegraph Co., 304 U.S. 333, 347, 58 S.Ct. 904, 911, 82 L.Ed. 1381 (1938), the Court stated:

The plain meaning of the Act is that if men strike in connection with a current labor dispute their action is not to be construed as a renunciation of the employment relation and they remain employes for the remedial purposes specified in the act.

On the following Monday, June 21, the employees presented themselves for work a third time and again offered to return to their jobs. The Company proceeded on the basis of new legal advice. This time reinstatement was conditioned upon the employees signing a form which read: "I the undersigned make an unconditional offer to return to my job. This is a voluntary offer."

■ When employees are on strike, the employer may take reasonable steps at the time striking employees return to work so that he will not be accused subsequently of improperly luring the strikers off the picket line. Although a document signed by an employee would not vindicate an employer where the facts clearly established that the solicitation was an unfair labor practice, the employer should be allowed to require a signed statement to protect himself from subsequent false charges. However, the wording employed here leaves much to be desired. It was not the responsibility of the employees to make an unconditional offer to return to work; it was the duty of the employer to make an unconditional offer of reinstatement. G.P.D. Inc. v. NLRB, 406 F.2d 26, 32 n.6 (6th Cir. 1969), cert. denied, 401 U.S. 974, 91 S.Ct. 1193, 28 L.Ed.2d 323 (1971). *See* NLRB v. Southern Greyhound Lines, 426 F.2d 1299 (5th Cir. 1970). *Cf.* NLRB v. International Van Lines, 409 U.S. 48, 50–51, 93 S.Ct. 74, 34 L.Ed.2d 201 (1972). The form does not limit itself to the protection allowed. It purports to be an un-

conditional offer to return to work. The employees were not required to make such an offer as a condition precedent to reinstatement.

It is unfortunate that the ambiguity was not discussed, clarified and rectified. Here, agents of a national union were present to represent the employees. Perhaps questions could have led to any needed clarification. That the Union declined to do so and advised its members not to sign is regrettable. Four strikers did sign and were immediately put back on the job. The rest of the employees, many of whom could not even speak or read English, were caught in the middle.

Under these circumstances, we feel constrained to find that the Company's second form required the employees to make an unconditional offer to return to work which the employees were not required to sign. Thus, the company failed to make an unconditional offer of reinstatement.

The Company's petition to set aside the Board's order is denied. The Board's cross-petition for enforcement is granted.

Enforced.