**LOCAL UNION NO. 787, INTERNATIONAL UNION OF ELECTRICAL, RADIO AND MACHINE WORKERS, AFL–CIO, Appellant,**

v.

**COLLINS RADIO COMPANY, Appellee.**

No. 19508.

United States Court of Appeals
Fifth Circuit.

May 8, 1963.

Rehearing Denied June 29, 1963.

Marvin Menaker, Wilson & Menaker, Dallas, Tex., for appellant.

George E. Seay, Malone, Seay & Gwinn, Dallas, Tex., for appellee.

Before BROWN and BELL, Circuit Judges, and SIMPSON, District Judge.

JOHN R. BROWN, Circuit Judge.

In assaying the correctness of the District Court's action denying the Union's application for an order to compel arbitration, § 301(a), 29 U.S.C.A. § 185(a), the critical issue is whether the contract excluded the particular dispute from the grievance machinery. We conclude that it did and therefore affirm.

This case, as we see it, presents not a single new issue. Its disposition depends on application of now well settled principles. The only difficulty is the difficulty inherent in the exercise of the judicial function as now so narrowly circumscribed by the celebrated trilogy [1] without transgressing the posted off-limits of the more spacious domain preserved exclusively for the arbiter.

▆▆▆ These principles may be broadly stated. Arbitration is a contractual procedure. The right to demand, or the duty to utilize, arbitration depends on the contract. Therefore, as with a traditional dispute, whether the contract requires arbitration is a question for judicial determination. But in the judicial ascertainment of this threshold problem, the Court must persistently and conscientiously resist the tempting process of determining, first, that the asserted grievance is palpably unfounded on its own intrinsic merits, so therefore it cannot be concluded that the parties agreed to arbitrate such a dispute. Such approach is indispensable for a scheme which assumes that for their own good reasons, the parties have bargained for a determination of controversies by an arbiter rather than a court. For, says the Court, the " * * * grievance procedure is * * * a part of the continuous collective bargaining process." [2] Recognizing that " * * * Congress * * * has by § 301 * * * assigned the courts the duty of determining whether the reluctant party has breached his promise to arbitrate * * * " since "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit * * *," the Court several times emphasizes that " * * * the judicial inquiry under § 301 must be strictly confined to the question whether the reluctant party did agree to arbitrate the grievance * * *." [2] The Court implements this in unmistakable terms. "An order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubt should be resolved in favor of coverage." [2] Resolving doubts in favor of coverage "only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail * * *." [2] In nearly every instance we have found that evidence wanting.[3]

▆▆▆ Although the receipt of certain portions of this type of evidence is itself an asserted ground of error by the Union, the parties in their briefs and arguments both recognize that it is essential for the Court to have a knowledge of the general background and setting of this dispute.

1. United Steelworkers of America v. American Manufacturing Co., 1960, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403; United Steelworkers of America v. Warrior & Gulf Navigation Co., 1960, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409; United Steelworkers of America v. Enterprise Wheel & Car Corp., 1960, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424.

2. These quotations come from 363 U.S. 574 at 581, 582, 583, 585, 80 S.Ct. at 1352, 1353, 1354.

3. Lodge No. 12, International Association of Machinists v. Cameron Iron Works, Inc., 5 Cir., 1961, 292 F.2d 112; Taft Broadcasting Co. v. Radio Broadcast Technicians IBEW, 5 Cir., 1962, 298 F.2d 707; International Association of Machinists, AFL–CIO v. The Hayes Corp., 5 Cir., 1961, 296 F.2d 238; Deaton Truck Line, Inc. v. Local 612, Teamsters Union, 5 Cir., 1962, 314 F.2d 418 [Nov. 16, 1962], on rehearing, [Mar. 14, 1963].

The collective bargaining contract was effective July 1, 1960, for a period of one year. There had been several contracts for the prior years, the last one expiring April 30, 1960. After May 1, 1960, a strike took place. After a week, the Employer resumed operations with a skeleton force. By letter of May 25, 1960, it advised the striking employees that it would start on May 31 hiring permanent replacements for those failing to return to their jobs. Between that date and June 5, at which time the strikers made an unconditional offer to return to work, the Employer had hired 65 persons as permanent replacements. Contract negotiations, in the meantime, were going on. In response to a specific request by the Union, the Employer on June 14 delivered a list of those permanently replaced.[4] On the same date (June 14) the Employer sent a letter to all of the 65 permanently replaced notifying each that his job had been filled with a permanent replacement. The letter also stated that if the recipient wished to be considered, with other applicants, for employment as a new employee as jobs opened up, the employment office should be advised. On June 16 the Union filed an unfair labor practice charge with the NLRB for having discharged these same specified 65 permanently replaced persons. The charge asserted that these persons had been discharged "because of their membership and activities in behalf of" the Union and that these actions "interfered with, restrained and coerced * * * [the] employees in the exercise of rights guaranteed in section 7 of the Act."[5] The status of these workers listed as permanently replaced was also the subject of extensive bargaining as the negotiations culminating in the contract of July 1, 1960, were carried on. The Union proposed that the Employer (1) reinstate all strikers with full seniority rights, (2) that it show the specified 65 on the hiring list, and (3) that it arbitrate the question of whether or not these listed persons were permanently replaced. The Employer rejected each of these proposals. The Employer's response was an insistence on exclusionary clauses in the grievance procedure. It also took the position that those persons who had not been permanently replaced would be put on a recall list, but those who had been permanently replaced would not. The Union subsequently accepted this. In the settlement agreement this was accomplished by attaching a list of employees to be recalled to work. This list purposefully omitted all of the 65 persons who had been permanently replaced (including the 38 in controversy here).

The contract, made in this setting, has two provisions which we regard as of decisive importance. First, in its opening paragraph, it expressly states that "This agreement [is made] between the * * * Company * * * and the * * * Union * * * for and in behalf of the *employees* now employed and hereafter employed by the Company" in its Dallas plants.[6] Second, in the "Grievance Procedure" it defined the controversies as those "between the employees and the Company" and expressly excluded those arising out of pre-contract occurrences and any controversy as to whether an individual had been permanently replaced prior to its effective date.[7]

4. Included in the 65 named persons were the 38 who are the subject of the asserted grievance.

5. For purposes of this case we regard as of no consequence the fact that the Regional Director on July 20 refused to issue a complaint and this action was sustained by the General Counsel.

6. Article I, § 1, provided that this " * * * agreement shall be binding upon the Company and the Union and upon all *employees* within the bargaining unit * * *." § 2 recognized the "Union as the sole * * * bargaining agency for all *employees*" in the unit. (emphasis added).

7. The exclusions are italicized:
"ARTICLE VII
"GRIEVANCE PROCEDURE
"Section 1. It is mutually understood and agreed that the prompt adjustment of grievances is desirable in the interest of sound relations *between the employees and the Company. No grievance, the basis for which occurred prior to the date of the signing of*

218

It was in this context that the Union on September 22, 1960, submitted this grievance:

"We protest the unfair action of the company by violating the seniority provisions of the current agreement. The company by its discriminatory action has not allowed employees to use their seniority rights, as granted under the terms of the contract. We ask for this condition to be corrected. Further, we ask for full compensation as a result of the above improper company action."

To this was attached the list of 38 names. The Employer refused to process the grievance and likewise rejected the Union's demand for arbitration.

■■■ While the Court in a suit to compel arbitration is generally " * * * confined to ascertaining whether the party seeking arbitration is making a claim which *on its face* is governed by the contract," [8] both parties in effect agree that it took extraneous evidence to reflect what the face really was. Thus, while it was stated in terms of discriminatory denial of seniority rights,[9] the evidence demonstrated that the controversy was actually a claim of unjustified refusal to *rehire* the 38 listed persons.

Not only did the evidence reveal this, but the Union candidly conceded that each of the 38 men "had no status as employees prior to the execution of [the] July 1st collective bargaining agreement" as each of them was "permanently replaced prior to the execution of this contract." The Union likewise conceded that the contract excluded from arbitration the question whether they had been permanently replaced. The whole case turned on the claim that "subsequent to the execution of" the July 1 contract "these men * * * obtained a status as employees." In other words the question, as the Union's trial counsel phrased it, "is whether or not something happened subsequent to this agreement to give a *new* status" to these men.

It was at this point that the Union offered evidence, not so it says to prove the ultimate merits, but to show at least an arguable basis for the contention that subsequent to July 1, the Employer had, in effect, *rehired* these men. Starting with this approach, the Union further asserted that whether this was the fact, or whether the evidence was sufficient from which to infer that conclusion, were questions solely for the arbiter.

■■■ The so-called evidence was limited to some IBM run sheets sent from the Employer's accounting department to the Union office after July 1, 1960, showing names, badge numbers of employees from whom union dues had been deducted under check-off authorizations. The names of the 38 appeared on the list.

*this agreement shall be considered or be subject to adjustment.* Any grievance arising under the terms or application of this agreement may be filed by an employee or group of employees, a steward or the Union, *provided that whether any individual has been permanently replaced or not prior to the date of signing of this agreement will not be the subject of a grievance and will not be subject to arbitration.* An honest effort shall be made to settle such grievances promptly through the following procedure: [Here steps 1 through 4 were described]."

"Article VIII—Arbitration, then provided: "Any grievance or dispute not settled under the fourth step * * * shall at the request of either party, be submitted to a Board of Arbitration."

8. 363 U.S. 564, 568, 80 S.Ct. 1343.

9. Presumably as a contractual sanction supplementing coercive relief available from the NLRB, the contract (Art. III, § 4) bound the Employer "not to interfere with the rights of its employees to become members of the Union, and [provided that] there shall be no discrimination, interference, restraint or coercion by the Company * * * against any employee because of Union membership * * * or in any * * * bona fide activity on behalf of the Union." Section 5 expressly provided that any question under § 4 would be subject to Step 4 of the Grievance Procedure. As to those having the status of an "employee," we may assume that it would be for the arbiter, not the enforcing Court, to determine whether the activity complained of constituted forbidden discrimination.

Assuming that this piece of evidence was admissible over the objection of the Employer,[10] it does not carry the day for the Union. Since the Union in seeking court enforcement of arbitration had to show that there was a controversy "on the face" of the asserted grievance, it necessarily opened up the evidence as it bore on that restricted, limited phase. While the Court is not permitted to weigh conflicting evidence, it had a right and duty to determine whether there was *any* evidence showing a grievance which the parties had agreed to arbitrate. From that standpoint the evidence was simply uncontradicted. The evidence from the Employer, the Union witnesses, and the stipulations of its own counsel, showed without a doubt that not a single one of these 38 men either had done a single minute's work between July 1 and the date of the grievance, or that they had been called back by the Employer to do so. None had any moral, legal or equitable claim for any compensation whatever.

The exclusionary terms used in the contract (see note 7, supra) were emphatic. Under no circumstances was the status of persons displaced prior to the execution of the contract to be the subject of the grievance machinery and arbi-

tration. This was stated in dual terms. One excluded the question of status as "permanently replaced or not." The second, even more broadly, excluded any grievance "the basis for which occurred prior to the date of the signing of this agreement." While the Union had contrived a beguiling theory to make this appear to be something other than what it really is, the effect is to allow arbitration of a dispute categorically excluded. Since in point of positive fact none has been an employee subsequent to the signing of the contract, never performed a single day's work or received, or was entitled to receive, a single cent as wages for services performed subsequent to July 1, the only basis for an arbiter's award would be one occurring prior to July 1.[11] The parties by the plainest of language excluded this controversy and all of those growing out of it from the grievance machinery.

■ This Court, following the admonitions of the Supreme Court's trilogy opinions, recognizes that the law is committed now to a hospitable application of the grievance machinery prescribed by parties to a collective bargaining contract. It has in numerous ways reflected that approach. See note 3, supra, and Sinclair Refining Co. v. NLRB,

---

10. Although we intimate no opinion lest we unwittingly trespass on the arbiter's power to determine the intrinsic merits, there may be considerable doubt that this evidence satisfied the requirements of a classic admission. First, there was no proof as to the system culminating in the IBM print-outs and upon which the Court could base a conclusion of reliability as a substitute for the traditional oath and cross examination. Cf. Missouri Pacific R.R. v. Austin, 5 Cir., 1961, 292 F.2d 415; Brown, Electronic Brains and the Legal Mind: Computing the Data Computer's Collision with Law, 71 Yale L.J. 239, 249 (1961). Second, while its technical authenticity might be assumed, there was no proof that the accounting department had any authority to hire or *report* hirings. Admissibility as an admission imputed to another depends primarily on the law of agency, and this is a question of the authority of the agent, here the accounting department.

See Compagnie De Navigation Fraissinet & Cyprien Fabre, S.A. and S.S. Allobrogia v. Mondial United Corp., 5 Cir., 1963, 316 F.2d 163; Cox v. Esso Shipping Co., 5 Cir., 1957, 247 F.2d 629.

11. To discuss this in terms of a possible award is not contrary to our holding in International Association of Machinists, AFL-CIO v. The Hayes Corp., 5 Cir., 1961, 296 F.2d 238, in which we said "Courts are not to concern themselves with what an arbitrator *might* do." 296 F.2d 238, 242. There we held it erroneous that "arbitrability was determined by the trial court in [the] terms of a possible award." Here, however, there is no question about the exclusion. It is plain and positive and the Union concedes it. Here a possible favorable award may properly be considered, not to show what is intended to be excluded, but to demonstrate that what is at issue in the grievance is the very thing the parties expressly excluded.

5 Cir., 1962, 306 F.2d 569, 575 to 579. But if full rein is to be given to this device as a means thought best able to achieve industrial peace, it must be enforced with an even hand. That which the parties have committed to the arbiter is for the arbiter alone, not the Court. Courts must assure that. But it is equally important to assure that neither party —through one guise or another—may obtain the intervention of an arbiter when the contract clearly excludes it from the reach of the grievance machinery.

The Court was here entitled, if not duty-bound to conclude, that this was a perversion of the grievance procedure and an effort by the Union to get through the grievance machinery new employment for those persons whose claims were expressly excluded from it.

 That leaves as an independent ground only the assertion that the Court erred in the receipt of evidence. As we have said, the Union had to offer some evidence to show the existence of a grievance. The evidence which we have considered bore directly on that limited issue. So far as the other evidence is concerned, it comprised two aspects. The first was testimony concerning the unfair labor practice charge which we regard as of no significance. The second revealed the exact setting in which the collective bargaining contract including the exclusionary clauses in the grievance machinery (note 7, supra) was consummated. This was not to use parole evidence to alter or vary. It was, as we have many times said, the essential act of the Court putting itself in the position of the parties at the time the contract was made. As the first step this is followed by consideration of the words used [12] as to which there is no dispute here.

Affirmed.

12. "A court called upon to determine the meaning of written contracts * * * looks primarily to the language of the contracts *after first placing itself* as nearly as possible in the position of the parties to them at the time of their execution." Fidelity-Phenix Fire Ins. Co.

v. Farm Air Service, Inc., 5 Cir., 1958, 255 F.2d 658, 660; Indemnity Ins. Co. of North America v. duPont, 5 Cir., 1961, 292 F.2d 569; American Agricultural Chemical Co. v. Tampa Armature Works, Inc., 5 Cir., 1963, 315 F.2d 856 (concurring opinion at page 861, note 4).