NEW ORLEANS STEAMSHIP ASSO-
CIATION, Appellant,

v.

GENERAL LONGSHORE WORKERS,
I. L. A., LOCAL UNION #1418,
etc., et al., Appellees.

No. 28732.

United States Court of Appeals,
Fifth Circuit.

Feb. 24, 1970.

Rehearing Denied April 7, 1970.

Andrew P. Carter, Chas. King Mallory, Monroe & Lemann, New Orleans, La., for appellant.

Victor H. Hess, Jr., Alvin J. Liska, New Orleans, La., for appellees.

Before TUTTLE, WISDOM and GOLDBERG, Circuit Judges.

TUTTLE, Circuit Judge.

The plaintiff, which represents various steamship companies and stevedoring companies, including T. Smith & Son, Inc., and Central Gulf Steamship Corporation, appeals from a judgment of the trial court dismissing their suit seeking enforcement of the award of an arbitrator in a dispute with two local longshore workers unions. The action is brought under the provisions of Section 301 of the Labor Management Relations Act (29 U.S.C.A. § 185). The action sought an injunction against an alleged no-strike clause violation of the contract between the parties.

The facts leading to the arbitration are not in dispute: On October 30, 1969, the plaintiff ordered its member, T. Smith & Son, Inc., to have a longshoremen gang at the wharves of the port of New Orleans at 8:00 A.M. to assist in the loading of the vessel, M/V Acadia Forest, of which the Central Gulf Steamship Corporation was the time charterer. The longshore gang of T. Smith & Son, Inc., appeared at the wharves adjacent to the vessel, but refused to go aboard the ship on the instructions of the presidents of the two defendant labor unions. Thereafter, the plaintiffs sought and obtained arbitration on the contractual legality of this work stoppage under Article XVII; and after a hearing before an arbitrator an award was made finding the defendant labor unions in violation of the Deep Sea Agreement and ordering them to cease and desist from continuing this work stoppage; the defendants refused to cease and desist, and the plaintiff filed this suit for injunctive relief under the statute, which provides for federal jurisdiction in suits for violations of contracts between employers and labor organizations without respect to any amount in controversy or without regard to the citizenship of the parties.[1]

The question before the trial court, and now before us, is whether the issues between the parties were arbitrable or not. It is the contention of the plaintiffs that whether or not the contract required its members to load this particular vessel with the particular type of a "load,"[2] was a question of interpretation.

---

1. This court has held that since this is an action to enforce an arbitration award and not for an injunction in a labor dispute, the Norris-LaGuardia Act does not inhibit the court from acting upon the remedy being sought. New Orleans Steamship Assoc. v. General Longshore Workers, I.L.A. Local Union No. 1418, 5 Cir., 1968, 389 F.2d 369.

2. We use the word "load" rather than "cargo" because the whole issue revolved around whether the word "cargo," as used in the contract, was an interpretable or arbitrable word or not.

The basic provisions of the contract which are here for our consideration are Article XVII(c) of the agreement, which reads as follows:

"The arbitrator's authority shall be limited to interpretation and application of the terms of this agreement. * * * The arbitrator shall have no authority to render decisions which have the effect of adding to, subtracting from, or otherwise modifying the terms of this agreement."

And the following two paragraphs from Article IV, which read as follows:

"Wherever the term 'cargo' is used herein it includes, but is not limited to, break bulk, containerized, unitized and prepalletized cargo, as well as trucks, automobiles and tractors. Wherever the term 'container(s)' is used herein it shall mean containers which are (2) feet or more in length.

\* \* \* \* \* \*

"A. Longshore Work—Locals 1418 and 1419

1. Longshore labor includes all men who move cargo direct from the point of rest on the wharf or from a rail car to shipside or ship's hatches (and vice versa), as well as men who work cargo direct from barge to ship (and vice versa). It also includes the fitting of ships for grain, livestock and explosives, shoring of cargo, lashing and securing of ship's cargo aboard vessels, loading, unloading and sacking of grain in bulk aboard vessels."

In order to make the case understandable, it is necessary to describe the vessel and its projected load which was involved at the time of the work stoppage. There seems to be no dispute as to these basic facts. This vessel is commonly referred to as a LASH-type vessel, and this, the trial court found, is apparently the first time in the history of the Port of New Orleans that a LASH-type vessel had come to that port. It differs from a regular freight vessel in the respects indicated in the following: The vessel is 43,000 tons, 860 feet long, and 107 feet wide; it does not have the traditional holds and hatches into which cargo is loaded from the adjacent wharves or from barges moored alongside in the water; it normally carries aboard 73 separate barges (it is actually capable of holding 80 barges), each of which is loaded with cargo. While the normal capacity of a traditional freighter is approximately 10,000 tons, the LASH-type vessel carries about 29,000 tons. The traditional freighter, with a normal cargo capacity, uses an average of 4 or 5 gangs, each of which consists of 18 men, who consume three 24-hour days to complete loading operations. A LASH-type vessel uses only one gang, consisting of 14 men, to complete the loading operation in between 24 to 36 hours.

The defendants simply argue that the language in the Deep Sea Agreement, which defines "cargo," supra, is not susceptible of any construction which would embody these separate barges which are to be placed aboard ship, and that the words "longshore labor" cannot possibly be construed as including such labor as is required to lift these barges aboard a LASH-type vessel. They contend, therefore, that in submitting this question to arbitration, the companies caused the arbitrator to violate that part of Article XVII(C), which provides, "The arbitrator shall have no authority to render decisions which have the effect of adding to, subtracting from, or otherwise modifying the terms of this agreement."

The appellants, on the other hand, take the position that the appellees are required to construe the terms "cargo" and "longshore labor" in order to determine that they do not respectively comprehend the barges to be loaded or the men who are to move such barges, and that, therefore, under the well-known doctrines established by the three cases, United Steel Workers of America v. American Manufacturing Co., 1960, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403; United Steel Workers of America v. Warrier and Gulf Navigation Co., 1960, 363 U.S. 574, 80 S. Ct. 1347, 4 L.Ed.2d 1409; and United Steel Workers of America v. Enterprise

Wheel and Car Corp., 1960, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424, the courts have no jurisdiction to re-interpret these clauses and substitute their judgment for that of the arbitrator. In short, the appellants contend that the trial court, in dismissing the complaint, fell into the error warned against by this court in Local Union No. 787, International Union of Electrical, Radio and Machine Workers v. Collins Radio Co., 5 Cir., 1963, 317 F.2d 214, and quoted subsequently by us in Oil Chemical & Atomic Workers International Union v. Southern Union Gas Co., 1967, 5 Cir., 379 F.2d 774, at page 776:

> "Therefore, as with a traditional dispute, whether the contract requires arbitration is a question for judicial determination. But in the judicial ascertainment of this threshold problem, the Court must persistently and conscientiously resist the tempting process of determining, first, that the asserted grievance is palpably unfounded on its own intrinsic merits, so therefore it cannot be concluded that the parties agreed to arbitrate such a dispute. Such approach is indispensable for a scheme which assumes that for their own good reasons, the parties have bargained for a determination of controversies by an arbiter rather than a court."

Here the trial court went to considerable lengths in considering the differences between the so-called "barges," which were to be lifted aboard this vessel, and more normal types of cargo, whether broken up individually into separate pieces or palletized or taken from wharves and piers or lifted from barges. The trial court, it seems clear to us, simply undertook to construe the language of the contract in which "cargo" is defined as including, *but is not limited to,* certain articles which do not include separate barges, and the court concluded that the parties did not intend the term "cargo" to include the barges here involved.

Similarly, the trial court went to some length to differentiate between the work performed by longshore labor normally, and that which would be involved in lifting the barges onto this particular vessel. The trial court concluded that it was so clear that the definition of "longshore labor" did not comprehend this operation; that it felt that to construe it differently would, in effect, violate the prohibition against "adding to" or "otherwise modifying the term" of the agreement.

The dispute between the parties, as we have stated above, is whether the term "cargo," as used in the contract, could reasonably be found by an arbitrator to include the barges that were lying alongside the Acadia Forest for loading, and whether the term "longshoreman," as used in the contract, could be construed by an arbitrator as including men whose duty it was to lift these barges aboard the vessel. These questions are for the arbitrator, not the court, to decide.

The judgment is reversed and the case is remanded to the district court for further proceedings not inconsistent with this opinion.