**INTERNATIONAL UNION OF ELECTRICAL, RADIO AND MACHINE WORKERS, AFL–CIO–CLC, Plaintiff,**

v.

**GENERAL ELECTRIC COMPANY, Defendant.**

**No. 68 Civ. 1863.**

United States District Court,
S. D. New York.

Jan. 13, 1971.

dence.' " Laws v. Celebrezze, 368 F.2d 640, 642 (C.A. 4, 1966).

---

Irving Abramson, New York City, for plaintiff; Robert Friedman, New York City, of counsel.

Nordlinger, Riegelman, Benetar & Charney, New York City, for defendant; David L. Benetar, Michael I. Bernstein, Stanley Schair, New York City, of counsel.

## OPINION

COOPER, District Judge.

Plaintiff, International Union of Electrical, Radio and Machine Workers, AFL–CIO–CLC (hereinafter "Union") moves pursuant to Section 301 of the Labor Management Relations Act of 1947, 67 Stat. 156, 29 U.S.C. § 185 and Rule 56, F.R.Civ.P. for summary judgment to compel the arbitration of thirty-nine (39)[1] grievances arising under the 1963–1966 and 1966–1969[2] national collective bargaining agreements (hereinafter "Agreements") between the Union and defendant General Electric Company (hereinafter "Company"). Finding no triable issues of fact as to arbitrability, plaintiff's motion is granted with respect to thirty-seven (37) grievances; it is denied with respect to two (2) grievances.[3]

* * *

Under International Union of Electrical, Radio and Machine Workers, AFL–CIO v. General Electric Company, 407 F. 2d 253 (2d Cir. 1968), cert. denied, 395 U.S. 904, 89 S.Ct. 1742, 23 L.Ed.2d 217 (1969), (hereinafter "1968 case"), we apply the following tests to the "narrow" non-standard[4] arbitration clause[5] and its limitations in the Agreements to determine whether a grievance is arbitrable as a matter of right (Article XV, Sections 4(b), (6)):

(1) Is there a claimed[6] violation of a specific provision[7] of the Agreements (and their limitations[8] and exceptions)?

(2) Does any clause in the Agreements specifically exclude certain disputes from arbitration?

*Subject Grievances*

I

N.D. 13267–91 (Fitchburg, Mass.)
N.D. 12142 (Fitchburg, Mass.)

These grievances concern retention of "Temporary" prices on turret

---

1. The amended complaint listed fifty-two (52) grievances. By stipulations thirteen (13) were disposed of by the parties and did not require our attention.

2. The parties concede that the provisions governing arbitrability and the subject matter of the grievances are identical for all pertinent purposes and do not seek to distinguish between the two Agreements.

3. The "unusually *complex*" and "*labyrinthine*" contract "resembl[ing] a trust indenture" (*1968 case*, infra, pp. 255, 257, and 258), the extraordinary large number of documents to be analyzed, the directive of our Circuit to give primary attention to criminal matters, account for the somewhat belated disposition of this motion.

4. As to the treatment of standard arbitration clauses, see United Steelworkers of America v. American Mfg. Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); United Steelworkers of America v. Enterprise Wheel & Car Co., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). See also John Wiley & Sons v. Livingston, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898.

5. The scope of the provision is discussed in Jones & Smith, The Impact of the Emerging Federal Law of Grievance Arbitration on Judges, Arbitrators and Parties, 52 Va.L.Rev. 831, 904, n. 181 (1966). The arbitrability provisions are contained in Article XV of the Agreements.

6. None of the claims asserted is "a perversion of the grievance procedure" or patent evidence of bad faith so as to justify the denial of the treatment of ordering arbitration accorded even "frivolous" matters covered by the Agreements. Local Union No. 787, IUE, Radio and Machine Workers, A.F.L.–C.I.O. v. Collins Radio Co., 317 F.2d 214, 220 (5th Cir. 1963), cited in *1968 case*, n. 12, at 259.

7. A violation must be of an express and not an indirect or implied purpose of the contractual provision in question. Article XV, Sections 6(a), (b).

8. We decide each dispute without relying upon a presumption of arbitrability, and therefore need not determine the legal effect of language in the Agreements purporting to negate such a presumption. *1968 case*, at 259.

lathe and drill operations (N.D. 13267–13291, numbering twenty-five (25)) and retention and reduction in one stud operation (N.D. 12142) at Fitchburg, Mass. In each case the Company maintained the piece prices, which it designated, for periods of time ranging from eleven (11) months to about thirteen (13) years.

The Union alleges that the long time period without change to "Standard" pricing was in violation of Article VI, Section 4(c) as to each of these above grievances. In addition, it contends that with respect to N.D. 12142, Article VI, Sections 4(a) and 4(b) require the finding that an established manufacturing method existed which created a Standard price, and that since there was no change of method there could be no reduction in price. The Company's most weighty contention is that Article XV, Section 7(e) of the Agreement excludes the grievances from arbitration.

Article VI—"Wage Rates"—provides in relevant part:

4. *Piece Prices—Hourly Rated Piecework Employees*

(a) Piece prices are classified as standard, temporary or special and all piecework vouchers will indicate the classification.

(1) *A Standard Piece Price* is one set where the manufacturing method has become established.

(2) *A Temporary Piece Price* is one set where the manufacturing method is under development or has been changed, or the average pieceworker on the job has not yet attained normal performance.

(3) *A Special Piece Price* is one set on work which usually repeats infrequently or is in small quantities or has some special feature or purpose.

(b) There will be no change in a standard price except where there is a change in manufacturing method.

\* \* \* \* \* \*

(c) Subject to the foregoing, the Company will replace a temporary price with a standard price within six months if reasonably possible under the circumstances.

If it were reasonably possible for the Company to place a standard price on the jobs under the circumstances, this would be a direct violation of Article VI, Section 4(c), supra. While the mere passage of six (6) months does not mandate a change of rate, under the Agreement the Company cannot arbitrarily refuse to re-structure the pricing system. The time elapsing after the establishment of a temporary price is only evidentiary and is not dispositive, standing alone, of whether Article VI, Section 4(c) has been violated. Once six (6) months have elapsed since the setting of a temporary price thereby triggering Section 4(c), time is only one factor among many for the due consideration of the arbitrator. Reasonableness is a key element in Section 4(c) by its express terms.

These grievances are not excluded from arbitration by Article XV, Section 7(e), which provides:

"7. \* \* \* In particular, it is specifically agreed that arbitration requests shall be subject only to voluntary arbitration, by mutual agreement, if they \* \* \*

(e) Would require an arbitrator to consider, rule on or decide the appropriate hourly, salary or incentive rate at which an employee shall be paid, or the method (day, salary or incentive) by which his pay shall be determined. (See footnote).

Footnote: Subsections e, f, and g above reflect the fact that this National Agreement does not set out specific rates or classifications for jobs, and are designed to confirm the intent of Article VI, Section 1 [9] and Article

---

9. "Article VI Wage Rates
1. Any question which affects hourly rates, piece-work rates or salary rates

of individuals or groups shall be subject to negotiation between the Local and the local Management."

VI, Section 5 (first sentence) [10] that disputes over individual job classifications, rates of pay, incentive standards, etc., are assigned by the parties to local negotiations, and not to arbitration."

The predecessor to Article XV, Section 7(e) was held merely to restrict an arbitrator's remedial powers and not the scope of arbitrability, Carey v. General Electric Company, 315 F.2d 499 (2d Cir. 1963), cert. denied, 377 U.S. 908, 84 S.Ct. 1162, 12 L.Ed. 179 (1964), and while Article XV, Section 7(e) is more specific, it is not sufficiently specific to exclude the grievances at bar from arbitration. *1968 case,* supra, at 263. The issue is not whether the arbitrator is called to determine an "appropriate" rate, but whether the present rate was maintained in violation of the Agreement. *1968 case,* supra, at 261–262.

We find each of N.D. 13267–13291 and N.D. 12142 arbitrable as containing a claimed violation of a specific provision of the Agreement and not specifically excluded from arbitration by any Agreement clause.[11]

However, the issues to be arbitrated are limited. The arbitrator may not mandate a new rate under these submissions. With particular relevance to N.D. 12142 where the rate was reduced, the Court of Appeals stated in the *1968 case*:

[T]he arbitrator cannot pass on the new rate in any way, although if he concludes that the old rate was standard and that the change in rate was not accompanied by a change in manufacturing method, he can order the old rate reinstated, if he sees fit." (at p. 263).

*The issues* [12] *for arbitration* [13] *are:*

For each of N.D. 13267–13291 and N.D. 12142: Was it reasonably possible under the circumstances for the Company to replace a temporary price with a standard price; if so was retention of a temporary price by the Company a violation of Article VI, Section 4 of its Agreement with the Union?

Additionally for N.D. 12142: Was the price established by the Company "Standard" within Article VI, Section 4 of its Agreement with the Union?

If the price established was "Standard," did the Company change the rate without an accompanying change of method, in violation of Article VI, Section 4 of its Agreement with the Union?

---

10. "5. Step Rates and Progression Scheddules The Union and Locals recognize that starting rates and job rates for hourly rated and salaried employees vary, depending on the job, its location and its surrounding circumstances."

11. Shields v. General Electric Company, 319 F.Supp. 606 (D.C.Ky.1970) is inapposite. This was an action brought by an individual employee seeking damages for breach of contract, not a determination of arbitrability. Of the *witnesses* called by plaintiff Shields, "none contended the issue herein is arbitrable as a matter of right." Shields, n. 1, at p. 607. It is hardly surprising that arbitrability was not argued extensively if at all by the parties in *Shields,* in view of the fact that the Company (defendant here and in *Shields*) has opposed Section 4(c) arbitration in the past and does so presently, and it was Shields himself who sought a judicial and not an arbitral determination of his dispute. In light of the questionable agency of plaintiff's "Union" witnesses in *Shields,* the case itself and testimonial abstracts submitted to us do not convince us that our Circuit's construction of Article VI, Section 4 in the *1968 case* is to be disregarded.

12. Article XV, Section 4(c): "If a final judgment of a court has determined that a request raises arbitrable issues, the court's decision shall specify in reasonable detail the issues as to which arbitration is directed. The arbitration shall thereafter proceed only upon the issues specified in such final court judgment and the arbitrator shall have no authority or jurisdiction to consider issues other than those specified."

13. While we delineate the issues, our formulations are intended to be read in the light of the discussion which precedes the specific framing of the issues.

## II

N.D. 10543 (Pittsfield, Mass.)
N.D. 11974 (Rome, Ga.)
N.D. 13391 (Fitchburg, Mass.)
N.D. 10269 (Pittsfield, Mass.)
N.D. 11397 (Rome, Ga.)
N.D. 17703 (Rome, Ga.)

■ Each of these grievances involves alleged violations of Article VI, Section 4(b), with N.D. 10543, 11974, and 11391 falling under the first paragraph of Article VI, Section 4(b), set forth in full, supra. The remaining national docket numbers—10269, 11397, and 17703—allegedly involve violations of the second and third paragraph of Article VI, Section 4(b), set forth, infra.

N.D. 10543 involves a four (4) gun welding stud operation, N.D. 11974 involves liquid simulated sheet windings, and N.D. 13391 involves certain drill operations. In each case, the Union contends that Standard prices were changed without a change in method in violation of Article VI, Section 4(b), first sentence, supra. While defendant raises several "defenses" which go to the merits rather than to arbitrability, it also contends the rates were temporary and relies upon Section XV, 7(e), which we have dealt with above. In accordance with the treatment herein we find N.D. 10543, N.D. 11974, and N.D. 13391 arbitrable under the *1968 case* criteria and frame similar limited issues:

*For arbitration the issues as to N.D. 10543, 11974 and 13391 are:*

Was the price established by the Company "Standard" within Article VI, Section 4 of its Agreement with the Union?

If the price established was "Standard," did the Company change the rate without an accompanying change of method, in violation of Article VI, Section 4 of its Agreement with the Union?

■ N.D. 10269, 11397 and 17703 involve interpretations of these portions of Article VI, Section 4(b):

\* \* \* Where such a change in manufacturing method is made, the price may be adjusted. However, such adjustment shall be limited to those parts of the job affected by the change.

In order that the operator will be able to make the same hourly earnings under a new price where a change in manufacturing method is made which does not reduce the job value on which the original price was computed, the adjusted price will be in direct proportion to the change in allowed time for the part of the job affected by the new method. When a price is reduced on such jobs, the employee and his representative will be given at least one week's notice that the price is to be changed.

N.D. 10269 involves work on transpose wire machines in the wire unit of the Distribution Transformer Department. The Union alleged a methods change had occurred in part of the operation but the Company went beyond the affected portion of the operation and reduced standard prices on those portions of the jobs unaffected by the methods change, in violation of Article VI, Section 4(b).

N.D. 11397 involved work on two (2) draw block and one (1) redraw machines The Union presses the point that following a change of method on the redraw operation and institution of a piece price which caused the employee to lose 80¢ per hour, the Company failed to maintain earnings where the change of method did not reduce the jobs' value and that the formula as to price adjustment should be applied in direct proportion to the change in allowed time for the unaffected part of the jobs involved.

N.D. 17703 involved piece work jobs in winding, build and cable areas. The Union contends the Company extended standard price changes beyond the change in method and extended the reduction to parts unaffected by the change.

Among defendant's contentions are that "new jobs" were created by major changes in methods and that Section 4 (b) therefore does not apply, and that

plaintiff seeks an arbitral determination that pricing is inadequate and expressly excluded by Article XV, Section 7(e).

The short answer is that "new jobs" is not a category in the contract for which defendant has found any reference and even a drastic change is still arguably the subject for a Section 4(b) grievance. We have already analyzed Article XV, Section 7(e); we do not share defendant's formulation or view.

We find N.D. 10269, 11397 and 17703 arbitrable as constituting a claimed violation of a specific provision of the Agreement and not specifically excluded from arbitration by any Agreement clause.

*For N.D. 10269, 11397 and 17703, the issue for arbitration* is whether the Company's actions in respect to these grievances constituted a violation of Article VI, Section 4(b).

### III

N.D. 12106 (Lynn, Mass.)
N.D. 13256 (Rome, Ga.)
N.D. 13257 (Rome, Ga.)
N.D. 13259 (Rome, Ga.)

■ These grievances involve the interpretation of Article X, Section 2(a) of the Agreement which reads in pertinent part:

2. *Hourly Rated Daywork Employees*

(a) An hourly rated employee on daywork when permanently transferred
* * *

(2) to a related daywork job having a higher job rate will be paid a rate not less than two steps below the job rate of the job to which he is transferred, and will thereafter progress to the job rate in not more than six months.

(3) through upgrading, to a daywork job having a higher job rate will be transferred at not less than his rate immediately prior to transfer and will be paid the job rate of the new job for normal performance.
* * *.

(5) to any daywork job, will receive the job rate of the job to which he is transferred for normal performance, but if after transfer he is on a progression schedule and receiving less than the job rate, he will progress to that job rate on steps in accordance with the applicable progression schedule; if not on a progression schedule he will progress to the job rate on the basis of performance.

\* \* \* \* \* \*

(b) The term "related daywork job" means a job having requirements which the experience of such employee in preceding jobs makes it possible for the employee to learn in a substantially shorter time than a new, inexperienced employee.

N.D. 12106 involves an employee Zaccone who was permanently transferred from one inspection job at an R–12 rate to another at R–15–1. The Union's position is that the R–15–1 job was related daywork job with respect to the R–12 job and therefore it was a violation of Article X, Section 2(a) (2) not to give the employee a rate not less than two steps below R–15–1 when he was permanently transferred. The Union similarly contends for N.D. 13257 and N.D. 13259: In N.D. 13257, an employee Peppers was permanently transferred to a related daywork job and was started at more than two steps below the job rate for such jobs. The same point is advanced for N.D. 13259 involving employees Denmon and Browning.

N.D. 13256 involves employee Fox who was upgraded from position as assistant boilerhouse operator, which he had held for thirteen (13) years to the position of boilerhouse operator. The Union argues that both jobs had the same qualifications and duties except that the upgraded job was R–25 with Fox paid at R–22; that Fox was doing normal performance on the upgraded job and therefore was entitled to the R–25 rate from the date of upgrade—in accordance with Article X, Section 2(a) (3).

Defendant maintains that plaintiff actually is seeking to have the arbitrator pass on the appropriateness of new rates which the Court of Appeals said was forbidden in the *1968 case* under Article XV, Section 7(e). Defendant emphasizes further that Article XV, Section 7(f) excludes the grievances from arbitration as the disputes necessarily involve emphasis on the elements of the jobs in question:

> 7. All requests for arbitration which are not subject to arbitration as a matter of right under the provisions of Section 6 above, are subject only to voluntary arbitration. In particular, it is specifically agreed that arbitration requests shall be subject only to voluntary arbitration, by mutual agreement, if they
>
> * * * (f) Would require an arbitrator to consider, rule on or decide any of the following:
>
> (i) The elements of an employee's job assignment;
>
> (ii) The level, title or other designation of an employee's job classification.[14]

Having discussed Article XV, Section 7(e) before, we turn to Article XV, Section 7(f). Unlike matters normally concluded at the bargaining table, the arbitrator is not being asked to assess the adequacy of any transfer rate or to set elements of a job. He is, however, being asked to determine whether the transfers of employees were in violation of an express provision in the Agreement. The language "'consider, rule on or decide" is not sufficiently specific to exclude otherwise arbitrable grievances under Article XV, Section 7(e) (*1968 case,* supra, at 262–263) or Article XV, Section 7(f).

Under the *1968 case* criteria the grievance is arbitrable as a matter of right.

*The issue for arbitration is*: Was the rate on transfer which the Company paid

employees in N.D. 12106, 13256, 13257 and 13259 in violation of Article X, Section 2 of the Agreement with the Union?

### IV

N.D. 10028 (Lynn, Mass.)

■ N.D. 10028 involves prior grievance N.D. 5842 (1961) in which the Company was found to have violated Article VI, Section 4(b) of the 1960–1963 Agreement because it did not limit its price adjustment on radial drilling of a given type of submarine gear casing to the set-up portion of the job which was affected by the change in manufacturing method.

The Union argues that the initial determination was final and binding and that the Company's refusal to give effect to the arbitrator's award violates Article XV, Section 5. The Company appears to contend that there exists no allegation of violation of an express purpose, rather that of an indirect or implied purpose or obligation (Article XV, Sections 6(b), 7(c), Defendant's main memorandum, at p. 3). It further contends the issues and facts are not the same and therefore the prior determination cannot be binding on the present dispute, for to hold so would alter the Agreement.

Article XV, Section 5 states in pertinent part:

> "The powers of an arbitrator shall include the authority to render a final and binding decision with respect to any dispute brought before him including the right to modify or reduce or rescind any disciplinary action taken by the Company but excluding the right to amend, modify or alter the terms of this Agreement, or any local understanding."

We find Article XV, Section 5 to be explicit and embody a direct purpose of assuring that an arbitrator's decree in a given matter will be given effect. Should an arbitrator exceed his powers,

---

14. Article X, Section 2(a) (5) cited by defendant (defendant's main memorandum, p. 3) would bring the grievances arguably under an express provision of the contract regardless of the ultimate result at arbitration.

proper measures may be taken without denying arbitrability at the outset. Whether the issues and facts are the same goes to the merits and not to arbitrability.

We therefore find N.D. 10028 to be arbitrable under the *1968 case* criteria.

*The issue for arbitration is:* whether the Company's actions in respect to N.D. 10028 constituted a failure to give final and binding effect to N.D. 5843 (1961) in violation of Article XV, Section 5 of the Agreement.

### V

N.D. 13671 (Lynn, Mass.)

 N.D. 13671 involves the Company's establishment of four (4) abnormal or off-standard shifts of six (6) consecutive days each with two (2) days off on the annealing furnace operation.

The Union's position: This is in violation of Article V, Section 1(a) which reads as follows:

### ARTICLE V

### Working Hours: Straight Time— Overtime

1. (a) *Workweek*

The regular working week for both salaried and hourly rated employees shall be 40 hours per week, 8 hours per day, 5-day week, from Monday to Friday inclusive. The workweek on multiple shifts may be less than 40 hours.

An employee's workday is the twenty-four hour period beginning with his regularly assigned starting time of his workshift, and his day of rest starts at the same time on the day or days he is not scheduled to work. His workweek starts with the start of his regularly assigned work period on Monday of that workweek, except on continuous operations. Upon commencing work on Monday at a newly assigned starting time which is earlier than his starting time during the preceding week, the workday immedi-

ately preceding such Monday shall end provided the employee has had a 24-hour period of rest prior to the newly assigned starting time.

Variations in hours of work and schedules of hours of the several shifts, including multiple shifts where the workweek starts late Sunday night and where such hours on Sunday are considered as part of the Monday workday, are subjects for local negotiations.

Defendant responds: Article XV, Section 6(b) of the Agreement, which requires allegation of a direct violation of an express purpose of the contractual provision in question prevents summary judgment. We agree.

The express purpose of Article V, Section 1(a) appears to be to define the workweek and the work day for overtime purposes, as the Section caption points out. It apparently is intended to establish a limit beyond which defendant must pay premium rates. While Article XV, Section 7(c) rejects from arbitration as a matter of right an "implied obligation," this may be a pearl of moisture on the parched lip of a judicial Tantalus who must determine arbitrability—an "implied obligation" is alluring in concept but elusive to grasp and the cause of considerable backache. Nevertheless, Article V, Section 1(a) expresses at best an implied obligation to arbitrate a grievance such as N.D. 13671 under the rubric of over-time pay. As the *1968 case* points out (at 259), merely citing or waving at a contractual provision does not in itself create sufficient wind to sail to the harbors of arbitration by way of an arguable violation of an express purpose of the contract.

Summary judgment as to grievance N.D. 13671 is therefore denied.

### VI

N.D. 12972 (Schnectady, N.Y.)

 This grievance involves rotation of shifts and premium pay on continuous operations in the wire mill.

**920**

The Union relies upon Article V, Sections 1(b), 4(a) (5) and 4(b) (1):

1(b) *Continuous Operations*

Special schedules of hours and overtime will apply on jobs which require continuous operation, such as powerhouse attendants and on jobs requiring continuous manufacturing processes such as those which, for reasons of protection of equipment and material, must be run on a 24-hour day and a week-by-week basis.

4. *Overtime—Continuous Operations*

The Company will pay an hourly rated or salaried employee on a nonexempt job for overtime as follows:

* * *

(5) On employee's 7th day of his workweek if such day is neither his Saturday, Sunday or observed holiday; or * * *

(b) At the rate of double time for hours worked either

(1) On the employee's 7th day of his workweek, if such day is his Saturday, Sunday or observed holiday; * * *

Without reiterating the intricacies of the work schedule at issue (Shambo's affidavit in support of plaintiff's motion for summary judgment, p. 10, diagram; plaintiff's memorandum, pp. 18–20), plaintiff maintains that by its computatation of the work schedule days and hours, the employee was not receiving his due compensation for overtime.

Defendant, however, relies upon Article V, Section 3(a) (1) and Article XV, Sections 4(b) (iv), 7(c), and 5, supra:

3. *Continuous Operations*

(a) Workday—Workweek

(1) When any employee on continuous operations has a scheduled workweek of 5 days at work and 2 days off, his first scheduled day off shall be considered as the 6th day of his workweek, and his second scheduled day off, whether or not successive, as the 7th day of his workweek. When such working schedule contains a regularly recurring workweek of 6 days at work and one day off, such scheduled day off shall be considered as the 7th day of his workweek and the day immediately preceding as the 6th day of his workweek.

4.

* * *

(b) In the consideration and decision of any question involving arbitrability (including any application to a court for an order directing arbitration), it is the specific agreement of the parties that:

(iv) In the consideration of whether a matter is subject to arbitration as a matter of right, a fundamental principle shall be that the Company retains all its rights to manage the business, including (but not limited to) the right to determine the methods and means by which its operations are to be carried on, to direct the work force and to conduct its operations in a safe and effective manner, subject only to the express limitations set forth in this National Agreement, Local Seniority Supplements executed under the provisions of Article XI thereof, and Local Understandings executed in accordance with Section 3 of Article XXI thereof; and it is understood that the parties have not agreed to arbitrate demands which challenge action taken by the Company in the exercise of any such rights, except where such challenge is based upon a violation of any such express limitations (other than those set out in Section 7 below).

Defendant believes the schedule in this grievance is not covered by the Agreement, that no Agreement provision prohibits the Company from determining or limiting the designation of the seventh (7th) day of the workweek for continuous operations not specifically covered by Section 3(a) (1), supra, that to do so would permit an arbitrator to add to and alter the Agreement's provi-

sions in direct contravention of Article XV, Section 5, supra, and violate the rights reserved to management under Article XV, Section 4(b) (iv)—all without any express limitation so permitting. We agree with defendant and deny consequently summary judgment.

Article V, Section 3(a) (1) provides for workweeks of five (5) days with two (2) days off and regularly recurring workweeks of six (6) days at work and one (1) day off. However, in weeks 1 and 2 of plaintiff's own diagram (Shambo's affidavit, p. 10), the employee works four (4) and seven (7) days and is off three (3) and zero (0) days respectively. We cannot therefore say as a matter of law that this grievance work schedule is included in the continuous operations schedules which the parties intended to send to arbitration. This situation is not expressly covered by the Agreement; the arbitrator cannot add to it. Furthermore, this question which is normally concluded at the bargaining table—as illustrated by Article V, Section 3(a) (1) itself—is a management prerogative unless expressly excluded.

Summary judgment as to grievance N.D. 12972 is therefore denied.

### Determination

Accordingly, we grant summary judgment for plaintiff on the issue of arbitrability as a matter of right in the following grievances:

N.D. 13267–13291
N.D. 12142
N.D. 10543
N.D. 11974
N.D. 13391
N.D. 10269
N.D. 11397
N.D. 17703
N.D. 12106
N.D. 13256
N.D. 13257
N.D. 13259
N.D. 10028

We deny summary judgment with respect to grievances N.D. 13671 and N.D. 12972.